In re BRANDED PRODUCTS,
INC., Debtor.

FEDDERS NORTH AMERICA,
INC., Plaintiff,

v.

BRANDED PRODUCTS, INC.,
et al., Defendants.

Bankruptcy No. 92–53548–LMC.
Adv. No. 92–5189–LMC.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

April 9, 1993.

Mallory L. Miller, Jr., San Antonio, TX, for debtor and defendant.

Gerry Lozano and Norman L. Nevins, San Antonio, TX, for plaintiff.

Michael Flume, San Antonio, TX, for defendants John Wright & Mike Bonham.

William A. Jeffers, Jr., San Antonio, TX, for defendant Texas Bank, N.A.

*DECISION ON PLAINTIFF'S MOTION FOR REMAND AND LIFT STAY, AND IN THE ALTERNATIVE, TO SEVER AND REMAND*

LEIF M. CLARK, Bankruptcy Judge.

CAME ON, for hearing, the motion of the Plaintiff, Fedders North America, Inc. ("Fedders"), to remand and lift stay, and in the alternative to sever and remand the above-styled adversary proceeding which Branded Products, Inc. ("Branded"), the debtor, had previously removed to this court from state court. In the context of its motion, Fedders argued that the court should abstain from hearing the matter. The court entertained argument from counsel. At the close of the hearing, the court took the matter under advisement and invited counsel to brief additional issues. This decision resolves those issues.

## I. BACKGROUND

On December 14, 1987, Branded and Fedders executed a Fedders Products Distributor Agreement (the "Distributor Agreement"). Pursuant to the Distributorship Agreement, Branded ordered products from Fedders which were paid for by advances on a line of credit established by Branded with Bombardier Capital Corporation.

On September 28, 1989, Branded entered into a Loan Agreement with Texas Bank, N.A. ("Texas Bank"). The Loan Agreement set forth a formula for the advancement of monies to Branded in accordance with the level of Branded's eligible accounts receivable. Branded granted a security interest in its various assets, including its accounts receivable, to Texas Bank to secure the loan. Pursuant to the Loan Agreement, Branded supplied a monthly Accounts Receivable Report to Texas Bank, detailing Branded's eligible accounts receivable. Texas Bank's collateral also included any cause of action Branded may have against Fedders.

In June 1991, pursuant to the Distributor Agreement, Fedders sold numerous air conditioning units (the "Units") to Branded and invoiced Branded for the sale. There-

after, Branded sold the Units to Builders Square. Branded invoiced Builders Square accordingly. The Builders Square account receivable was listed on the monthly Accounts Receivable Report issued by Branded to Texas Bank.

Subsequently, Builders Square paid Branded, and Branded deposited the proceeds in a bank other than Texas Bank. Texas Bank considered this a violation of the Loan Agreement. Texas Bank requested that Branded cure the alleged default. Branded then delivered a check to Texas Bank for the entire amount of the Builder's Square payment. Texas Bank accepted this payment and applied it to the Branded debt.

Branded, however, never paid the debt it owed to Fedders. Fedders filed suit in state court (the "State Court Action")[1], naming as defendants Branded, Branded's President, Ron Seago, Texas Bank and two employees of Texas Bank, John Wright and Mike Bonham.[2] Fedders alleged eleven claims against the various defendants, including tortious interference with contract, conversion, civil conspiracy, lender liability, constructive trust, unjust enrichment, fraudulent transfer, and breach of duty of good faith. Branded answered and filed a counter-claim, alleging a history of actions on the part of Fedders causing the financial demise of Branded and sounding in fraud, breach of contract, duress and coercion, tortious interference with contract, misrepresentation, deceptive trade practices, and breach of duty of good faith. The court has granted leave to Branded to amend its counter-claim petition, alleging numerous claims against Fedders, including claims for equitable subordination, a determination of secured status and priorities, voidable preference, and fraudulent transfers. Texas Bank, John Wright and Mike Bonham have filed a cross-claim

against Branded seeking contribution and indemnification.

Discovery in the state court action has commenced, but has not been concluded. The only action heard in the State Court Action pertained to a discovery dispute. On July 10, 1992, Texas Bank, John Wright and Mike Bonham filed a Motion for Summary Judgment, seeking to dispose of all the issues between Fedders and the Nondebtor Defendants, as well as the claims for contribution and indemnity.

The Summary Judgment Motion, however, has yet to be heard. The State Court Action has been stayed by Branded's filing of its petition for relief under chapter 11 of title 11 of the United States Code on October 1, 1992. On October 15, 1992, Branded removed the State Court Action to this court. On November 3, 1992, Fedders filed the motion currently before the court.

## II. JURISDICTION AND THE INTERPLAY BETWEEN 28 U.S.C. § 1334 AND 28 U.S.C. § 1452

At hearing, the parties advanced several arguments on the interplay between the bankruptcy jurisdictional statute, 28 U.S.C. § 1334, and the bankruptcy removal and remand statute, 28 U.S.C. § 1452. Fedders, relying principally upon *In re Chiodo*, 88 B.R. 780 (W.D.Tex.1988) (recommendation adopted), argued that abstention under § 1334(c) applies in the case of a removed matter, and should be applied here. Branded and the Nondebtor Defendants countered, contending that the court may not remand a removed action under the authority of § 1334(c).

The interplay between the doctrines of abstention and remand in bankruptcy has been much discussed but little understood. The doctrines have been intermixed and confused in dozens of decisions,[3] in no

---

1. The State Court Action was filed on October 25, 1991 in the 166th Judicial District Court of Bexar County, Texas.

2. Texas Bank, John Wright and Mike Bonham are sometimes referred to herein as the "Nondebtor Defendants."

3. By way of a small sampling, *see generally Lone Star Industries, Inc. v. Liberty Mut. Ins. Co.*, 131

B.R. 269 (D.Del.1991) (remand appropriate because of predominance of state law issues and likelihood of jury trial); *Drexel Burnham Lambert Group, Inc. v. Vigilant Ins. Co.*, 130 B.R. 405 (S.D.N.Y.1991) (remand appropriate because matter was not sufficiently related to administration of bankruptcy case to warrant retention in federal court, given predominance of state law claims); *O'Rourke v. Cairns*, 129 B.R. 87

small part because Congress itself codified a judge-made rule of limited application (abstention), then placed it within the bankruptcy *jurisdiction* statute. In the process, Congress used language so loose that even its sponsors misunderstood the reach of the statute they had just enacted. *See* discussion *infra.* A closer examination of the respective remand and abstention statutes may help to clear up some of the confusion.

■ Section 1452(a) allows a party to remove any claim related to a bankruptcy case to the bankruptcy court if the court has jurisdiction under § 1334. The statute is generous in its authorization of removals, excepting from removal only those proceedings pending before a tax court or those proceedings in which a government agency is enforcing its regulatory or police powers. 28 U.S.C. § 1452(a). Once a cause of action is removed, it automatically comes under the province of the district court. If that court determines that it does not have subject matter jurisdiction over the matter, or is not otherwise properly before the court, it may dismiss the action.[4] On motion of a party, the court may also decide to send the matter back to the tribunal from whence it came, on any equitable ground.

Section 1334, by contrast, defines the jurisdictional bounds of the district court, and, by extension, the bankruptcy court to whom the matter has been referred. Section 1334 is sectioned into four subparts. Subparagraph (a) grants original and exclusive jurisdiction of all cases under title 11 of the United States Code to the bankruptcy courts. Subparagraph (b) grants original, but not exclusive, jurisdiction over all civil proceedings arising under title 11, or arising in or related to cases under title 11. Subparagraph (d) gives the bankruptcy court exclusive jurisdiction over all property of the debtor. Subparagraph (c), enacted in two paragraphs, codifies the so-called discretionary and mandatory abstention provisions, discussed further below.

As a *doctrine,* abstention under § 1334(c), be it mandatory or discretionary, has no application in the context of a removed action. "[T]he mechanics of abstention are premised on the existence of two proceedings: one in bankruptcy court and a second in state court. Indeed if there were only one proceeding, and the court abstained with respect to it, nothing would go forward. In a removed action, there is perforce only one proceeding once removal has been made." *In re Fairchild Aircraft Corp.,* 4 Tex.Bankr.Ct.Rep. 308, 313, 1990 WL 119650 (Bankr.W.D.Tex.1990), *recommendation adopted,* slip op. (W.D.Tex. 1990) (citing *In re 666 Associates,* 57 B.R. 8, 12 (Bankr.S.D.N.Y.1985)). This view contrasts with that of my former colleague, Bankruptcy Judge R. Glen Ayers, Jr., who opined that the only occasion to ever invoke the doctrine of abstention is in the context of removal. *See In re Chiodo,* 88 B.R. at 785. With all due respect to Judge Ayers' decision, this court believes that premise to be faulty. For example, were a debtor to initiate a compulsory counterclaim via an independent adversary proceeding in the bankruptcy court instead of asserting the claim in a pending state court action, "... as the matter no doubt involves the same transaction, abstention (even mandatory abstention) could well apply even though

(E.D.La.1991) (remand of medical malpractice claim against debtor estate); *In re Micro Design, Inc.,* 120 B.R. 363 (E.D.Pa.1990) (remand appropriate because bankruptcy court could not conduct jury trial and would have to abstain anyway); *Gorse v. Long Neck, Ltd.,* 107 B.R. 479 (D.Del.1989); *Cook v. Griffin,* 102 B.R. 875 (N.D.Ga.1989) (remand because state law issues predominate and matter could not have been commenced in federal court but for the bankruptcy petition); *Western Helicopters, Inc. v. Hiller Aviation, Inc.,* 97 B.R. 1 (E.D.Cal.1988); *Allen County Bank & Trust Co. v. Valvmatic Intern. Corp.,* 51 B.R. 578 (N.D.Ind.1985) (district court

would have to abstain from hearing removed action).

4. There is no provision for summary dismissal of or hearings on removal petitions in bankruptcy as there are under the general removal statute. *Compare* 28 U.S.C. § 1452(a) *with* 28 U.S.C. § 1446(c)(4), (5). If the court lacks subject matter jurisdiction over the removed action, it may act *sua sponte,* but in the usual instance, it would be up to a party to bring such a defect to the court's attention, presumably in the context of a motion to remand.

the removal statute had not come into play." *See Fairchild,* 4 Tex.Bankr.Ct.Rep. at 313 n. 2. When a case is removed to federal court from state court, by contrast, the case file is literally transferred, and there is no case any longer pending in the state court. The federal court can then return the case file to state court by remanding the case.

But federal courts do not effectively respond to removed cases by abstaining from hearing the case, for that would not send the case back to state court. The usual procedural device employed to "abstain" is to *dismiss* the matter pending before the federal tribunal, so that the parallel matter can proceed in the alternate forum (e.g., state court, administrative board). *See* 17A C. WRIGHT, A. MILLER, E. COOPER, FEDERAL PRACTICE AND PROCEDURE, Jurisdiction 2d, § 4245, at 102 (2d ed. 1988); *Burford v. Sun Oil Co.,* 319 U.S. 315, 334, 63 S.Ct. 1098, 1107, 87 L.Ed. 1424 (1943); *New Orleans Public Service, Inc. v. City of New Orleans,* 798 F.2d 858 (5th Cir.1986), *cert. den.,* 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 515 (1987).[5] Invoking abstention in the context of a removed case would result (in the usual case) in *eliminating* the lawsuit. Remand, on the other hand, *preserves* the lawsuit, without disturbing original filing dates or such service of process as may have been accomplished before the suit was removed to federal court.[6] Again, removal and remand contemplate *one action,* the question presented being *which tribunal* handles it. Abstention, on the other hand, contemplates *two actions* (or the potential for two actions), the question presented being *which action* will take

precedence and go forward first (or in lieu of the other).

Abstention has not only been confused with remand. It has also on occasion been mistakenly read as a limitation on subject matter jurisdiction in the bankruptcy context (hence the oxymoron *mandatory abstention* ). *See* 28 U.S.C. § 1334(c)(2); *see, e.g., State Bank of Lombard v. Chart House, Inc.,* 46 B.R. 468, 470–71 (N.D.Ill. 1985). The position of Fedders in this case is but a reflection of that confusion. Fedders in essence argues that this court should abstain because it does not have subject matter jurisdiction over the matter. While the relief accorded in response to a motion to dismiss for lack of subject matter jurisdiction and a motion to abstain would be essentially the same (i.e., dismissal), the confusion is nonetheless pernicious, because it presumes a limitation on the subject matter jurisdiction of the district court not in fact present in section 1334. *See In re Wood,* 84 B.R. 432, 434 (S.D.Miss.1988) ("[a]bstention is more appropriately characterized as a *discretionary* exercise of subject matter jurisdiction").

Under traditional notions of abstention, a court declines to assert its otherwise valid subject matter jurisdiction over a particular matter, finding that the matter is better resolved in state court. The doctrine was born a 1941 Supreme Court decision, *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and extended two years later in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). A variant of Burford-type abstention began developing after the Supreme Court's 1971 decision in *Younger v. Harris,* 401 U.S. 37, 91

**5.** Wright and Miller take note of a proposal by the American Law Institute that a federal court should retain jurisdiction over the matter before it, but stay it pending the resolution of the state proceeding, as an alternative to outright dismissal. *Id.* at 103. Of course, such retention would *also* be inconsistent with remand, which removes the case from the federal court's docket and sends it back to state court.

**6.** This is not to say that the standards that might be employed by a court faced with a motion to remand under Section 1452(b) are not in fact

quite similar to the standards employed when considering a motion for permissive (or discretionary) abstention under Section 1334(c)(1). In fact, this court has acknowledged the similarity of the analysis in prior decisions. *See In re Fairchild Aircraft Corp.,* 4 Tex.Bankr.Ct.Rep. 308, 313, 1990 WL 119650 (Bankr.W.D.Tex. 1990), *recommendation adopted,* slip op. (W.D.Tex.1990). But the relief accorded in response to the two kinds of motions is different—dismissal in one case, transfer via remand in the other. The procedural context dictates which motion is appropriate.

S.Ct. 746, 27 L.Ed.2d 669 (1971).[7] Abstention undercuts the practical exercise of otherwise properly invoked federal jurisdiction, depriving the party opposing it of its choice of forum,[8] and imposing duplication of effort and delay on all parties. As such, abstention has been applied gingerly in civil proceedings, with full knowledge that its use bars the door to federal court for a litigant, even though the jurisdiction of that court has otherwise been properly invoked. The Supreme Court has criticized the too-facile application of the abstention doctrine. "This Court repeatedly has stated that the federal courts have a 'virtually unflagging obligation' to exercise their jurisdiction except in those extraordinary circumstances 'where the order to the parties to repair to the State court would clearly serve an important countervailing interest.'" *See Deakins v. Monaghan,* 484 U.S. 193, 203, 108 S.Ct. 523, 530, 98 L.Ed.2d 529 (1988) (citing *Colorado River Water Conservation District v. U.S.,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 14–15, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983)). By the same token, however, abstention (especially *Younger*-type abstention), accords comity to state proceedings, vindicating state court procedures and the validity of state court determinations, and so can serve a legitimate end, even in the context of bankruptcy proceedings.

In the bankruptcy context, the closest analog to traditional abstention is what has come to be called by practitioners, jurists, and seminar panelists the "discretionary abstention" provision, found in section 1334(c)(1). Indeed, as written, this particular subsection does not so much *authorize* discretionary abstention as it *clarifies* that district courts may apply the doctrine of abstention, as developed in the case law,[9] to proceedings in bankruptcy cases as well.[10] The statutory statement is consistent with the provision for concurrent jurisdiction set out in section 1334(b). *See* 28 U.S.C. § 1334(b). Given the breadth of potential bankruptcy jurisdiction spelled out in section 1334(b), and the potential for federal adjudication of things like divorce, child custody proceedings, drunk driving charges, license revocation proceedings, and the like, section 1334(c)(1) is at the least salutary, even though its enactment was probably not necessary.[11]

The best that can be said for subsection (c)(1), then, is that we never needed it in the first place, but at least it does not hurt anything, because it simply reiterates and ratifies existing law. Subsection (c)(2) presents quite a different story, however. Section 1334(c)(2) was enacted in 1984 in direct response to the Supreme Court's decision in *Northern Pipeline Constr. Co. v.*

---

**7.** *Younger* involved an effort to have a federal court enjoin an action taking place in state court. The Court discussed the importance of respecting notions of Federalism by according comity to state tribunals of competent jurisdiction. *Id.* at 44–45, 91 S.Ct. at 750–51. Students of bankruptcy abstention will readily recognize how this notion has leaked into the current formulation of section 1334(c)(2), discussed *infra.*

**8.** This is especially telling when the matter has come to federal court via the invocation of diversity jurisdiction, but has also been of special importance in years past when individuals seeking to protect their civil rights from infringement could only hope for redress if they were in a federal rather than a state court.

**9.** The "interest of justice, or in the interest of comity with State Courts or respect for state law" language echoes *Younger* and its progeny. *See Pennzoil v. Texaco,* 481 U.S. 1, 107 S.Ct.

1519, 95 L.Ed.2d 1 (1987); *Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

**10.** Actually, this is an important provision in its own right, for abstention is not normally invoked when an action is initiated in federal court pursuant to a federally-created *statutory* scheme. This is because notions of comity would, in the usual instance, yield to the Supremacy Clause in such cases. Section 1334(c)(1) is, in effect, a statutory exception to federal preemption.

**11.** Given the development of *Younger* abstention over the last twenty years, federal courts would have had little difficulty in abstaining from conducting child custody hearings, for example, with or without section 1334(c)(1). *See, e.g., Middlesex County Ethics Comm. v. Garden State Bar Assoc.,* 457 U.S. 423, 431–32, 102 S.Ct. 2515, 2520–21, 73 L.Ed.2d 116 (1982).

*Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which held that the existing jurisdictional structure of the bankruptcy courts was unconstitutional because it vested Article III judicial power in Article I judges. Attempting to fix this constitutional infirmity, Congress enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984, first assigning all federal jurisdiction over bankruptcy matters to the district court (in section 1334), then apportioning the exercise of that jurisdiction "into 'core' proceedings, over which the bankruptcy courts exercise full judicial power—and 'otherwise related' or 'non-core' proceedings—over which the bankruptcy courts exercise only limited power" in section 157. *Matter of Wood*, 825 F.2d 90, 91 (5th Cir.1987). The remedy to the constitutional problem identified in *Marathon* was thus furnished by the division of *authority* over certain matters in 28 U.S.C. § 157 between the bankruptcy court and the district court. *See In re 666 Associates*, 57 B.R. 8, 13 (Bankr. S.D.N.Y.1985). That should have been the end of the matter.

However, Congress, apparently out of concern over whether the division of the jurisdictional grant between core and noncore proceedings in § 157 sufficiently accomplished its goal, saw fit to also enact § 1334(c)(2).[12] Said one of the sponsors of the bill in Congressional hearings, "[m]andatory abstention is important to be consistent with the Marathon decision and the express intent of both the House and Senate in attempting to reestablish a constitutional bankruptcy court. The Supreme Court made it clear that the Article I bankruptcy courts *could not adjudicate proceedings involving State-created rights.*" 130 CONG.REC. S76, 19 (daily ed. June 19, 1984) (comments of Sen. Heflin) (emphasis added). This is a gross misstatement of the holding *Marathon*, and betrays the legal error that lay behind the enactment of section 1334(c)(2).[13] Other statements of legislative leaders echo that Congress enacted the so-called "mandatory abstention" provision, intending to clarify the jurisdiction of the bankruptcy court, and succeeding instead only to make it murkier.[14]

12. "Congress intended no change in the scope of jurisdiction set forth in the 1978 Act when it later enacted section 1334 of the 1984 Act." *See Matter of Wood*, 825 F.2d 90, 93 (5th Cir.1987).

13. *Marathon* most certainly did not hold that bankruptcy courts could not adjudicate "state-created rights." It held that Article I courts could not adjudicate "private rights." *Marathon*, 458 U.S. at 83–87, 102 S.Ct. at 2877–80. Bankruptcy courts adjudicate state-created rights all the time, whenever they rule on the allowance of claims, yet few members of Congress would be willing to call the claims allowance process the adjudication of "private rights"—unless they are also prepared to accord to bankruptcy judges life tenure and Article III status.

14. Relevant portions of the legislative history of § 1334(c)(2) read as follows:

As most of my colleagues are aware, the Senate conferees differed over whether to retain the abstention language found in the original Senate bill. The majority of the Senate conferees—this Senator included—felt that the Senate language was too broad, in that it prohibited the bankruptcy courts or district courts from considering any case that was based upon a state law claim. *Mandatory abstention in favor of state courts in those cases was required. The House provision on abstention was, however, limited to Marathon*

*type proceedings and the party seeking abstention would have been required to show that the cause could be timely adjudicated in the state court before abstention would have been required.*
130 CONG.REC. S88, 90 (daily ed. June 29, 1984) (comments of Sen. Dole) (emphasis added).
Senator Hatch commented:

It should be remembered here that we are speaking of adjudication of causes of action that are local in origin and arise completely independent of any title 11 proceeding. Their only relation to the title 11 proceeding is that the debtor, quite apart from the bankruptcy proceeding, may be a responsible party or an injured party according to state law. These adjudications then involve questions of state law and do not raise federal questions. *The "federal question" of the amount the debtor bankrupt can or will pay on each claim cannot arise until after the claim has been adjudicated. As a result, to avoid this constitutional problem of the extension of Article III jurisdiction to purely local causes, both H.R. 5174, and the Committee Amendment (No. 3083) provide for abstention in all civil proceedings involving claims or causes derived from state law and incapable of Article III jurisdiction absent the title 11 proceeding.*
130 CONG.REC. S88, 96 (daily ed. June 29, 1984) (analysis of Sen. Hatch) (emphasis added). If Senator Hatch's comments are to be believed,

The *Marathon* court merely determined that disputes incidentally related to a bankruptcy case, but involving purely "private rights," cannot constitutionally be determined by Article I courts. Such disputes, of course, could be constitutionally settled by Article III courts, to the extent they otherwise have jurisdiction under § 1334. Had the *Marathon* case been originally brought in a federal *district* court, there never would have been a *Marathon* problem. This is because the issue was not one of jurisdiction *per se*, but of constitutionality. Members of Congress erroneously believed they were following the Supreme Court's lead by enacting section 1334(c)(2). In fact, they enacted a statute which, if in place when the *Marathon* litigation was initiated, would have prohibited the *district* court from hearing the case, even though the matter fell within the subject matter jurisdiction of the court.[15]

Comments of Senator Hatch [16] indicate that an additional reason for enacting subsection (c)(2) was to relieve the overburdened district courts which would otherwise "have to" adjudicate matters more properly heard by state courts anyway, but that justification makes little sense, because subsection (c)(1) would already ac-

complish that result. In form and function (not to mention placement), section 1334(c)(2) operates as a limitation on the subject matter jurisdiction of federal courts—a limitation which is internally inconsistent with both section 1334(b) and the intentions of Congress (at least as that intention has been interpreted by courts since 1984). *See, e.g., Robinson v. Michigan Consolidated Gas Co.,* 918 F.2d 579, 584 (6th Cir.1990); *In re 666 Associates,* 57 B.R. 8, 13 (Bankr.S.D.N.Y.1985).

All that *Marathon* ever required was adequate provisions to assure that an Article I court would not adjudicate disputes involving the resolution of "private rights." Section 1334(c)(2) evidently accomplishes that goal by requiring the *Article III* court to "abstain" from hearing a *Marathon*-type case, assuring that it will not even be adjudicated in the federal system, much less decided by an Article I tribunal. The problem, of course, is that mandatory abstention in such a context means mandatory dismissal, and so re-institutes the same summary/plenary distinctions and piecemeal litigation that the Bankruptcy Reform Act of 1978 was designed to eliminate. Congress, of course, is free to change its

---

all *claims litigation* should proceed via law suits in state court before being handled in bankruptcy, a reading that would convert bankruptcy into a cumbersome, hyperexpensive and thoroughly impractical remedy completely out of step with the structure of the Bankruptcy Code itself. No court has ever given to section 1334(c)(2) the interpretation here suggested by Senator Hatch.

**15.** The doctrine of abstention contemplates that the court has jurisdiction, and thus the discretion on whether to abstain. *See Chiodo,* 88 B.R. at 785 ("[i]f the court does not have jurisdiction under § 1334(b), abstention under § 1334(c) cannot arise"). Section 1334(c)(2) by definition applies to cases over which the court has jurisdiction, because it applies by its own terms to those cases in which the matter in question is "related to" a case under title 11. *See Matter of Wood, supra.*

**16.** Senator Hatch noted:

In addition to the constitutional question of jurisdiction, allocation of responsibility between the federal and state judiciary (10th Amendment) also supports mandatory abstention. Marathon decided that the bankruptcy

judge cannot adjudicate the state claims, and further, that the bankruptcy judge could only provide narrowly circumscribed assistance as an adjunct or magistrate to Article III courts. Therefore, without mandatory abstention in the district courts, already overburdened with judicial responsibility, would have a massive influx of additional cases requiring the district court to adjudicate all of the state court actions with only limited assistance from bankruptcy judges.

As a result, the district court would be adjudicating nondiversity state actions, no matter how small, while the state courts would not be able to consider cases well within their expertise as well as within their case load 'budget.' Mandatory abstention for all such adjudications of state-created actions that would otherwise be in a state forum, would prevent this unanticipated case load burden on the district courts.

130 Cong.Rec. S88, 96 (daily ed. June 29, 1984) (analysis of Sen. Hatch). One has to wonder just why Congress felt it had to *require* the district court to abstain, if the primary justification was to accomplish what district judges "already overburdened with judicial responsibility" were already willing and able to do anyway pursuant to section 1334(c)(1).

mind, but one has to wonder whether, in 1984 at least, Congress even *knew* its mind. All the protections against a repeat of *Marathon* were already in place in section 157. Nothing further was needed. By enacting section 1334(c)(2), Congress gave statutory dignity to a feature of federal jurisprudence whose constitutional underpinnings have always been in doubt, and whose broad application had never previously been endorsed by the highest court in the land. Congress would go far to clear up much unwarranted confusion by simply repealing section 1334(c)(2).

▮ It is at least clear from the foregoing that section 1334(c)(2) can have no application to removed actions. What is more, given the presence of section 1334(c)(1), there is real doubt whether subsection (c)(2) has any practical application *at all*. We know, for example, that it cannot apply to claims litigation (unless we are also prepared to find that virtually *all* claims litigation must be heard in state court, as virtually all claims are premised on state law). We also know that all litigation against the debtor is stayed by operation of section 362, to prevent just such piecemeal litigation. And we know from the Supreme Court that the claims adjustment process lies at the core of the bankruptcy court's equity jurisdiction. *See Langenkamp v. Culp*, 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990). Thus, virtually all non-bankruptcy litigation in which the debtor is the *defendant* is litigation to which section 1334(c)(2) was never meant to apply.

That leaves litigation initiated *by* the debtor. Of this type, there are three. First, there is litigation that arises in or under the Bankruptcy Code itself, such as preference actions. These matters are by definition excluded from section 1334(c)(2). Second, there are cases that are not related to the bankruptcy case, that could not conceivably affect the administration of the case. *See Matter of Wood*, 825 F.2d 90, 91 (5th Cir.1987). These matters are outside the subject matter jurisdiction of the federal court and would be dismissed under section 1334(b), without resort to section 1334(c)(2). Again, by definition, they are not the subject of section 1334(c)(2). Third, there is litigation initiated by the debtor against third parties, but not under any provision of the Bankruptcy Code. These are related proceedings, for which adequate provision has already been made in section 157(c)(1) (to avoid the *Marathon* problem). True, were the debtor to initiate a child custody proceeding in bankruptcy court, for example, abstention might apply. But the court already has the necessary tools with which to dispose of such rare and unwelcome pieces of litigation—in section 1334(c)(1).

Section 1334(c)(2), as a practical matter then, turns out to be a useless appendage on the bankruptcy jurisdictional scheme—an appendage over which bench and bar frequently trip. Congress would do well to do us all a favor and simply remove it from the statute, before somebody gets hurt.

Given the foregoing, the court declines to entertain Fedders' motion to abstain, as that motion has no application in this procedural context. It remains, then, to determine whether Fedders' motion to remand is well-taken. That, in turn, requires us to first determine whether the lawsuit in question is one within the subject matter jurisdiction of the federal court. If it is, then we must then turn to the various equitable considerations which are to be examined to determine whether a matter should be remanded. In the process, we will have to examine whether the litigation is core or non-core. Finally, if the matter is remanded, we must then decide the extent, if any, to which we should lift the automatic stay to permit Fedders to proceed.

## A. The Court has Jurisdiction Over This Matter

At the outset, Fedders argues that this court does not have subject matter jurisdiction as the action is a non-core proceeding, neither arising under nor related to a case under title 11. To support this position, Fedders argues that any recovery it makes in this case will, in all likelihood, be against Texas Bank, not the debtor. Indeed, Fed-

ders has not filed a proof of claim in this case, and has thus far indicated that it does not intend to.

According to Fedders' description of the case, the critical issue in the case is whether Branded was acting as an agent for Fedders when Branded turned over the funds to Texas Bank. Fedders posits that the court must determine in what capacity Branded owes Fedders. Fedders acknowledges that, if the court finds that Branded was not Fedders' agent, then Fedders' suit is little more than the assertion of a claim against Branded. Now that Branded is in bankruptcy, that claim would be assertable only against Branded's estate and its resolution would be a core matter, over which this court clearly has jurisdiction. 28 U.S.C. § 157(b)(2)(B), § 1334(b); 11 U.S.C. § 502(a). If, on the other hand, the court were to determine that Branded owes Fedders as a mere agent in possession of Fedders' funds and that Branded converted the funds by paying Texas Bank, then only a constructive trust action would lie against Branded, which Fedders suggests would not be a core proceeding. *See Mutual Benefit Life Insurance Co. v. Pinetree, Ltd. (Matter of Pinetree, Ltd.)*, 876 F.2d 34, 36 (5th Cir.1989) (action on constructive trust does not involve property of the estate; *see also Vineyard v. McKenzie (Matter of Quality Holstein Leasing)*, 752 F.2d 1009 (5th Cir.1985); *Selby v. Ford Motor Co.*, 590 F.2d 642 (6th Cir.1979).

■ A matter falls within the core jurisdiction of the bankruptcy court if it involves a substantive right solely created by the federal bankruptcy law and could not exist outside of bankruptcy. *See Matter of Wood*, 825 F.2d 90, 97 (5th Cir.1987); 28 U.S.C. § 157(b)(2)(B–N); *see also Matter of Candelero Sand & Gravel, Inc.*, 66 B.R. 903, 906 (D.P.R.1986); *In re Pierce*, 44 B.R. 601, 602 (D.Colo.1984) (breaches of contract actions, and other similar business torts, cannot be labeled "core" proceedings). Where a matter is not core, it must be at least "related to" the administration

of the bankruptcy case for the bankruptcy court to have jurisdiction over the matter.[17] *See* 28 U.S.C. § 1334(b). Otherwise, the court lacks jurisdiction and the case should be remanded immediately to state court. 28 U.S.C. § 1452(a).

■ A dispute is related to a bankruptcy case when the outcome will affect the property of the estate available for distribution to creditors. *See Pettibone Corp. v. Easley*, 935 F.2d 120 (7th Cir.1991). The Fifth Circuit has found that a matter is related to a bankruptcy where the outcome of the proceeding could *conceivably* have an effect on the administration of the bankruptcy estate. *Matter of Wood*, 825 F.2d 90, 93 (5th Cir.1987). "[T]here must be a reasonable nexus or logical connection between the civil proceeding for which jurisdiction is sought and the parent bankruptcy proceeding." *In re American Energy, Inc.* 50 B.R. 175, 179 (Bankr.D.N.D.1985).

■ Even if the Fedders action against Branded is a non-core proceeding, the action is nonetheless sufficiently related to the Branded bankruptcy case for the court to find that it has jurisdiction over the matter. The outcome of this litigation will have a direct impact on the distribution of the estate. Branded, while acknowledging a debt owed to Fedders, has answered, disputing the amount of that debt on the basis of a claimed offset by Branded, a failure of Fedders to grant certain credits to Branded, and the value of Branded's counterclaim against Fedders, discussed *infra*. As the lawsuit is currently postured, the net amount of Fedders' state law claim against Branded is at issue, and the determination of that issue would necessarily affect the amount available for distribution to creditors. Because the controversy has a direct impact on the administration of the bankruptcy estate, the adversary proceeding is "related to" a case under title 11. *Matter of Wood* 825 F.2d at 94. In addition, Branded's counterclaims are root-

---

**17.** Absent consent of the parties, "[t]he bankruptcy judge's authority over non-core proceedings which are related to a case under Title 11 is restricted to hearing the case and submitting proposed findings of fact and conclusions of law to the district court who in turn enters final judgment." *In re American Energy, Inc.*, 50 B.R. 175, 178 (Bankr.D.N.D.1985).

ed in the same operative facts as the Fedders claim, and must be heard lest they be barred under the doctrine of *res judicata. Matter of Baudoin,* 981 F.2d 736, 744 (5th Cir.1993). In addition, the court in *Wood* noted that, where a "plaintiff alleges liability resulting from the joint conduct of the debtor and nondebtor defendants, bankruptcy jurisdiction exists over *all* claims under § 1334." *Id.*

Thus, the court concludes that it has subject matter jurisdiction over the case as presently postured. It is important to note that, even though Fedders has filed no proof of claim against the debtor in this bankruptcy case, it is nonetheless *pursuing* a claim against the debtor via the state court action. Purely as a matter of *jurisdiction,* that matter falls within this court's purview. It is quite a different matter whether Fedders will in fact be permitted to proceed with its claim against Branded via this litigation, however, because a creditor's attempt to liquidate a cause of action against a bankruptcy debtor outside the bankruptcy forum is automatically *stayed.* The resolution of that important, but nonetheless entirely separate, question, is left for later in this decision. It is enough for the resolution of this particular question that Branded's removal of this lawsuit to this court did not violate this court's subject matter jurisdiction.

## B. *MOTION TO REMAND, AND IN THE ALTERNATIVE, TO SEVER AND REMAND*

Section 1452(a), the bankruptcy removal statute, affords the estate an opportunity to centralize all litigation in one forum, the bankruptcy court. *Fairchild,* 4 Tex.Bankr. Ct.Rep. at 313 (citing H.REP. No. 595, 95TH CONG., 1ST SESS. 45 (1977); *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 87 n. 40, 102 S.Ct. 2858, 2880 n. 40, 73 L.Ed.2d 598 (1982);

*A.H. Robins v. Piccinin,* 788 F.2d 994, 1014 (4th Cir.1986)). Once an action is removed to the bankruptcy court, the court, upon motion of a party, may remand the matter to state court. Section 1452(b) is broad in scope; the district court may remand on any equitable grounds, without further review. 28 U.S.C. § 1452(b).[18]

■ The scope of bankruptcy removal is broad indeed.[19] It is considerably broader than that available in nonbankruptcy matters. *See Browning v. Navarro,* 743 F.2d 1069, 1076 n. 21 (5th Cir.1984). For example, removal of a nonbankruptcy related matter to a federal court is not automatically granted. *See Adolph Coors Co. v. Sickler,* 608 F.Supp. 1417 (C.D.Cal.1985). Federal courts subject nonbankruptcy removal petitions to evidentiary hearings to determine if invocation of federal jurisdiction is proper. 28 U.S.C. § 1446. A federal court may also summarily dismiss a removal petition without a hearing, upon a mere review of the moving papers. *Id.* On the other hand, bankruptcy removal is automatic, and the removed matter will be tried by the bankruptcy court, absent a successful motion for abstention or remand. *See* 28 U.S.C. § 1452(a), (b). In addition, a federal court's decision not to remand a nonbankruptcy civil matter is reviewable for an abuse of discretion. However, where a district court reviews a bankruptcy court's decision not to remand an action removed under the bankruptcy removal statute, the district court's decision is *not* reviewable, not even for an abuse of discretion. *Id.* The considerable discretion afforded by statute to the bankruptcy court demonstrates Congress' clear policy favoring consolidation of matters affecting the administration of the bankruptcy estate and disfavoring piecemeal adjudications. *See Fairchild,* 4 Tex.Bankr.Ct.Rep. at 314.

---

**18.** If the bankruptcy court makes the initial decision, the parties may obtain appellate review of that decision. No appellate review is available from the district court's decision, however. *See* 28 U.S.C. § 1452(b) (as amended in 1990).

**19.** Section 1452 permits the removal of any action provided (1) the matter is not a Tax Court proceeding; (2) the matter is not an enforcement action by a governmental agency exercising its regulatory or police powers, and (3) the district court has jurisdiction of the claim or cause of action under § 1334. 28 U.S.C. § 1452(a).

■ The Fifth Circuit has indicated some of the equitable grounds a court may consider in deciding a motion to remand in the bankruptcy context. They include:

1. forum non conveniens;

2. a holding that, if the civil action has been bifurcated by removal, the entire action should be tried in the same court;

3. a holding that a state court is better able to respond to questions involving state law;

4. expertise of the particular court;

5. duplicative and uneconomic effort of judicial resources in two forums;

6. prejudice to the involuntarily removed parties;

7. comity considerations;

8. a lessened possibility of an inconsistent result.

*See Browning v. Navarro*, 743 F.2d 1069, 1077 (5th Cir.1984). Not all the considerations discussed by the Fifth Circuit are applicable to the case at bar, and our discussion will be limited to those which apply.

■ Initially, of considerable importance in this case is the fact that Branded has chosen this forum. *See In re Fairchild Aircraft Corp.*, 4 Tex.Bankr.Ct.Rep. 312, 314, 1990 WL 119650 (Bankr.W.D.Tex. 1990). Where the debtor chooses to remove an action to the bankruptcy court, that choice is given great weight. *See In re El Paso Pharm*, 130 B.R. 492, 497 (Bankr.W.D.Tex.1991).

Fedders notes that state law issues dominate the lawsuit as grounds for remand. The central dispute between the parties involves a determination of whether Branded, pursuant to the Distributor Agreement, was an agent of Fedders. If so, then a constructive trust or similar action might lie against Branded for conversion of Fedders' funds. If, on the other hand, the court decides that Branded is not an agent,

the dispute might be resolved by the straightforward application of Article 9 of the Uniform Commercial Code. In either case, the application of state law is necessary.

But the mere presence of state law issues cannot, of itself, be sufficient to compel remand, for bankruptcy courts routinely apply and construe state law in claims litigation, lien fights, and the like. The state laws which would come into play here are well settled, requiring little, if any, new interpretation by this court. Nor is there likely to be any potential for this court's resolution of the matter to have any impact on any important state policy.[20] The fact that the law suit may be resolved under state laws does not, of itself, require the court to remand the action. *See Matter of Wood*, 825 F.2d 90, 96 (5th Cir.1987).[21]

It is not certain whether a state court can hear this matter any quicker than the bankruptcy court. *See El Paso Pharm*, 130 B.R. at 496 (state courts rarely faster, fairer to the estate, less expensive than claims allowance process); *Fairchild*, 4 Tex.Bankr.Ct.Rep. at 318 (same). Little discovery between the parties had been undertaken in the state court. Prior to removal, the state court had heard only a discovery dispute. The state court has set the matter on the jury trial docket in May, 1993, but that is no guaranty that the case will in fact be tried in May, even if the case is promptly remanded. This court is prepared to hold a jury trial, but could not likely hear the matter before this fall. Therefore, the equities appear to be balanced regarding whether the matter will be heard faster and with less expense in state court than in federal court.

The current structure of section 157(c), however, adds an additional wrinkle to the prompt adjudication question. If this is indeed only a related proceeding, and if it is also the adjudication of "private rights,"

---

**20.** *See In re Republic Reader's Service, Inc.*, 81 B.R. 422, 424 (Bankr.S.D.Tex.1987) (abstention only appropriate where state law is unsettled and broad impact on state policy present).

**21.** The "predomination of state law" factor takes on greater importance when the cause of action falls more uniquely within the special expertise of state courts, such as might child custody hearings, for example, or when the cause of action arises in an area of unsettled state law.

(as it certainly appears to be from a facial reading of the pleadings), then it is a *Marathon*-type lawsuit, which cannot be finally adjudicated by an Article I court (absent the consent of the parties). Section 157(c) provides the sufficient means to assure that *Marathon* will not be violated, by requiring that in such situations only the district court may enter a judgment adjudicating and disposing of the matter. 28 U.S.C. § 157(c)(2). Unfortunately, that section also assures that a final judgment must await the district court's review of the bankruptcy court's report and recommendation. *Id.* That additional delay must be factored into the "prompt adjudication" calculus, and tips the scales slightly in favor of remand.

Fedders further argues that remand is appropriate since Fedders has requested a jury trial, regardless whether this matter is determined to be core or noncore. This court has held on previous occasions that a jury demand is not a "magic bullet" with which one can, with certainty, kill any attempts to bring litigation into the bankruptcy court, and reiterates that position here.[22] The provision governing jury trials in bankruptcy is codified at 28 U.S.C. § 1411(a). That section provides that the provisions of the Bankruptcy Code do not affect a litigant's Seventh Amendment right to a jury trial. Section 1411(a) is silent regarding the appropriate forum for these jury trials, however. Are they to be heard in the bankruptcy court or the district court? The circuits are in disarray. *Compare In re Ben Cooper, Inc.*, 896 F.2d 1394 (2d Cir.), *vacated*, 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 408 (1990), *reinstated*, 924 F.2d 36 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2041, 114 L.Ed.2d 126 (1991) *with In re Grabill Corp.*, 976 F.2d 1126 (7th Cir.1992) *and In re United Missouri Bank*, N.A., 901 F.2d 1449 (8th Cir. 1990) *and In re Kaiser Steel Corp.*, 911 F.2d 380 (10th Cir.1990). The Fifth Circuit has not definitively ruled on this issue. *See Matter of Jensen*, 946 F.2d 369 (5th Cir.1991).

The Supreme Court has in recent years adopted a strict plain meaning approach to construing the Bankruptcy Code and related statutes. *See, e.g., Taylor v. Freeland & Kronz*, —— U.S. ——, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992); *Conn. Nat. Bank v. Germain*, —— U.S. ——, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992); *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). While section 1411(a) does not specify the proper forum for a bankruptcy trial, section 157 does state that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11." *See* 28 U.S.C. § 157(b)(1). A plain reading of this language supports the conclusion that bankruptcy judges are empowered to proceed, as necessary, to determine all core proceedings arising under title 11, without regard to whether a litigant demands a jury trial.

Certainly litigants do not forfeit their Seventh Amendment right to a jury trial merely by litigating in the bankruptcy arena. *See M & E Contractors v. Kugler-Morris General Contractors*, 67 B.R. 260, 265 (N.D.Tex.1986). Nor does the simple fact that a litigant has requested a jury trial affect the "core" nature of the proceeding. "The subject matter of the claim, not the procedure used to assess factual disputes, determines the 'core' status in bankruptcy." *See In re Grabill Corp.*, 976 F.2d 1126, 1128 (7th Cir.1992) (Easterbrook, J., dissenting). To assert that a bankruptcy judge may not conduct jury trials in core proceedings actually conflicts with a plain reading of § 157(b)(1).

Recent circuit courts have placed heavy reliance on the absence of any express

---

**22.** In fact, if the law were otherwise, the result would defeat Congress' intention to create a tribunal to consolidate disputes relating to a debtor, for their quick and efficient adjudication. *See Grabill*, 976 F.2d at 1130 (Easterbrook, J., dissenting). "[A]ny creditor who does not like the way the way the bankruptcy judge is proceeding may ask for a trial and get not only a jury but also a different judge—unless the district judge returns the dispute to the bankruptcy judge to consider a motion for summary judgment. The costs of judicial badminton would have to be borne if Congress had specified that bankruptcy judges cannot hold jury trials, but it did not." *Id.*

grant of authority permitting a bankruptcy judge, as an Article I judge, to conduct a jury trial. However, no statute prohibits it, either. Indeed, bankruptcy judges exercise inherent, uncodified, authority every day to conduct the business of their courts. There is also no express authority for bankruptcy judges to sign orders, yet no one doubts their authority to do just that, simply because they are judges. Similarly, "[t]he [Bankruptcy] Code does not mention testimony, cross-examination, briefs, oral argument, summary judgment or any other ingredient of modern adjudication, yet all agree that bankruptcy judges may take evidence and allow cross-examination." *See Grabill*, 976 F.2d at 1128 (Easterbrook, J., dissenting).

To argue that a bankruptcy judge cannot conduct jury trials because the Bankruptcy Code does not specifically so provide is to assume that express authorization is necessary in the first place. That assumption, however, is flawed. A quick review of Title 28 will confirm that there is also no express statutory authorization for *district* judges to conduct jury trials, but no one questions that omission, any more than they would question the right of district judges to hear evidence, sign orders or wear robes. It all goes with the job of being a judicial officer.

The argument has also been advanced that only those courts established under Article III of the Constitution may conduct jury trials. Once again, this argument is flawed by reality: many non-Article III courts conduct jury trials every day. *See, e.g., United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (magistrates may conduct jury trials); *Grabill*, 976 F.2d at 1129 (Easterbrook, J., dissenting) (judges in District of Columbia, federal territories and military are non-Article III judges and conduct jury trials). Indeed, "[t]he ability to conduct a jury trial is not an exclusive function of an Article

III court." *See M & E Contractors*, 67 B.R. at 266.

Another argument often raised is that bankruptcy judges, as Article I judges, should not be permitted to conduct jury trials since Article I judges do not have life tenure on the bench, like Article III judges.[23] However, this concern, as noted by Judge Easterbrook in his dissent in *Grabill*, is really much ado about nothing:

Tenure does not insulate the fact-finding process; quite the contrary, juries protect the citizens from tenured officers. The longer the tenure, the greater the need for the leavening effect of the jury. Temporary participants in the judicial process, jurors instill common sense and apply the balm of mercy, bringing law-in-action closer to contemporary beliefs about just outcomes. Why should it be objectionable for arbiters with 14–year terms to use this institution is beyond me. Juries may be less important when judge's terms are shorter, but they are no less appropriate. The higher costs, the lack of discipline, and the inconsistency that lead some to prefer judicial over lay decision do not change with the tenure of the umpire. And if bankruptcy judges with limited tenure are themselves problematic, *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the presence of juries ameliorates rather than aggravates. Decision by a jury removes the onus of fact-finding from the non-tenured bankruptcy judge.

*See Grabill*, 976 F.2d at 1129 (Easterbrook, J. dissenting).

Judge Easterbrook further points out that, rhetoric about life tenure aside, there is no substantial difference between the terms of bankruptcy judges and Article III judges. While Article III judges are appointed for life, subject to good behavior, the average tenure of a federal district judge is 14 years. Bankruptcy judges, who

---

**23.** The theory is that bankruptcy judges, eager for reappointment after their 14–year tenure, may curry favor with the masses with biased ruling to secure their own futures. The flaw in that argument is that bankruptcy judges are appointed by circuit court judges, not the masses, and reappointment is generally secured by fidelity to the law and impartiality. *See Grabill*, 976 F.2d at 1130.

are appointed for 14–year terms, are usually appointed younger and may be reappointed. Usually a bankruptcy judge who seeks reappointment is successful if the judge exhibits "good behavior." *See Grabill*, 976 F.2d at 1129 (Easterbrook, J., dissenting).

In short, there are no valid arguments against a bankruptcy judge validly conduct a jury trial, at least with respect to the core matters presented by this litigation.

Fedders further argues that it will be denied its right to a jury trial as to those proceedings which are non-core. This point has considerably more strength, as the structure of section 157(c)(1) places the conduct of a jury trial for non-core proceedings by the bankruptcy court in greater doubt. Even in the non-core context, however, the court rejects the notion that a jury demand is a "magic bullet." The fact that a debtor may be entitled to a jury trial does not *mandate* that the court remand a non-core matter to state court. *See In re El Paso Pharm*, 130 B.R. 492, 495 (Bankr. W.D.Tex.1991).[24]

It is, however, crippling. The law is not yet settled on this important issue, introducing an element of risk and uncertainty that would not be present were the suit tried in state court. Of course, much of that uncertainty can be eliminated by a request to the district court to withdraw the reference, but that process of itself adds confusion and delay to the adjudication of the lawsuit that would not be present were the matter to return to state court.

Fedders also states that fairness and economy dictate that the action should be remanded. Whether remand would be more fair or economical is in some ways a function of point of view. From the debtor's perspective, the bankruptcy forum is a much more economical forum in which to resolve Fedders' claims against the estate, and to recover Branded's offsets against Fedders. And the bankruptcy court is more likely to apply the doctrine of equitable subordination fairly and correctly than would a state court unfamiliar with the concept. Too, the natural bias against "bankrupts" one might expect from a state court jury might be ameliorated in the bankruptcy forum. As noted previously, the resolution of this lawsuit will control not only the amount, but also the very existence of Fedders' claim against the estate, should it ever be asserted.[25] The bankruptcy court's jurisdiction to determine the allowance of a claim against a bankruptcy estate is original, but it is not exclusive. *See* 28 U.S.C. § 1334(b). A non-bankruptcy tribunal also has the jurisdic-

---

**24.** A bankruptcy court may indeed not render a final judgment when a claim is deemed to be a non-core but "related to" claim, arising as a cause of action under state law absent consent of the parties. *See* 28 U.S.C. § 157(c)(1). When a bankruptcy judge hears a non-core matter, the judge submits proposed findings of fact and conclusions of law to the district court, which in turn enters a final judgment. *Id.* The final judgment is entered only after the district court reviews *de novo* those matters to which a party has timely and specifically objected. *Id.*

In the context of a jury trial, the findings and conclusions submitted by the bankruptcy judge would be the jury's verdict, including the instructions to the jury and the jury's responses to the questions presented. The *de novo* review by the district court, contemplated under 28 U.S.C. § 157(c)(1) is not plenary, but rather is limited to those matters to which the district court is timely directed by the parties. The review is thus no broader than the review which parties might request of the district court via a motion for new trial or a motion for judgment notwith-

standing the verdict had the case been tried in the first instance by the district court. The review thus contemplated by section 157(c)(1) need not be construed to conflict with the Seventh Amendment's proscription on retrying jury verdicts other than as permitted under the common law in place as of the enactment of the amendment. The district court need only to remain faithful to its obligation to apply the statute in such as way as to avoid a conflict with the Constitution. *In re El Paso Pharm*, 130 B.R. 492, 495 (Bankr.W.D.Tex.1991). Under that authority, a jury demand is not fatal, not even to a removed *Marathon*-type action.

**25.** It is certainly conceivable that, at some stage, Fedders might decide that it was in its best interest to file a proof of claim in this bankruptcy case after all. It would then argue, no doubt, that that claim, though untimely, should be allowed as an amendment of the timely "informal claim" that this lawsuit constitutes. We need not discuss here whether such an effort would or would not succeed.

tion to hear and determine the allowance or disallowance of a claim, though the bankruptcy court is by far the preferred locale for bankruptcy claims adjudication. *See El Paso Pharm,* 130 B.R. at 496. The resolution of the dispute at bar necessarily requires a determination of Fedders' and Texas Bank's claims against the estate. If Fedders prevails on the litigation, Texas Bank will have a secured claim; if not; Texas Bank will be paid in full. The most efficient forum for the management of competing claims against the estate is normally the bankruptcy court, not the state court. *See In re Fairchild Aircraft Corp.,* 4 Tex.Bankr.Ct.Rep. 312, 316, 1990 WL 119650 (Bankr.W.D.Tex.1990). Additionally, Branded's counterclaims may result in a recovery for Branded against Fedders, augmenting the estate.

Judicial economy would clearly be disserved were the court to sever the nondebtor defendants from the action and remand only that action to the state court. The evidence to be introduced against the nondebtor Defendants as to their liability to the plaintiff is essentially the same as that which Fedders must introduce in its litigation with Branded. Furthermore, the evidence to be presented regarding the defenses of the nondebtor Defendants is the same as that to be introduced by Branded with respect to a determination of the character of Branded's liability to Fedders. The scarce judicial resources of both the state and federal judiciary would thus be unnecessarily consumed by reviewing the same evidence in separate proceedings. Such duplication of efforts is the antithesis of judicial economy.

Severance of the nondebtor Defendants also raises the specter of inconsistent results in the state and federal forums. For example if severance were allowed, the bankruptcy court may find that Branded was not an agent of Fedders, and the sale of the Units to Builders Square generated an account receivable which was property of Texas Bank. On the other hand, the state court may determine that Branded was an agent of Fedders and that Branded converted the funds. Accordingly, the state court could find that a constructive trust existed and require Texas Bank to turn over the monies to Fedders. Should this occur, the nondebtor Defendants, who are asserting claims for contribution and indemnity, could then be asserting claims against the Debtor's estate arising from the state court decision which the bankruptcy court had found not to exist. Such inconsistent results may impede the smooth administration of the bankruptcy estate in the future, and the court deems it best to avoid this potential problem by not severing any portion of the case.

The court granted leave to Branded to amend its counter-claim to raise core matters under 28 U.S.C. § 157(b) and Bankruptcy Rule 7001. Branded's original counterclaims, as well as the counterclaims it has indicated it yet intends to file, are sufficiently intertwined with the Fedders claim as to require that the same court hear all claims in the case, and, therefore, these too should not be severed.

The concept of judicial economy is an underlying rationale for permitting counterclaims. *See O'Donnell v. Archie's Motor Express,* 176 F.Supp. 36, 37 (E.D.Pa. 1959). By allowing counterclaims, a court may dispose of all claims between the parties, even those unrelated to the main claim. *See Matter of Penn Central Transportation Co.,* 419 F.Supp. 1376, 1383 (E.D.Pa.1976). The allowance of counterclaims is favored by the judiciary. *See Penn. R. Co. v. Mustante–Phillips, Inc.,* 42 F.Supp. 340, 342 (N.D.Ca.1941) (permitting counterclaim serves to avoid circuity of action, inconvenience, expenses, consumption of court's time, injustice). Where the permissive counterclaim involves may of the same factual or legal issues or the issues result from the same basic controversy between the parties, "fairness and considerations of convenience and economy require that claimant be permitted to maintain the cause of action." *See Great Lakes Rubber Corp. v. Herbert Cooper Co.,* 286 F.2d 631, 634 (3rd Cir.1961). Severance of the counter-claim would defeat the stated goal of judicial economy.

The counterclaim, as amended, addresses certain core matters including lien validity

and equitable subordination. Core matters of a bankruptcy case do come within the original jurisdiction of the bankruptcy courts, and would best be heard there. *See* 28 U.S.C. § 1334(a). However, the state courts share concurrent jurisdiction with the bankruptcy courts, and can try these issues; some education would be required, but the factual issues are not particularly arcane, and the legal issues are easily briefed. While the state court might not be the preferred forum to try such issues, it is certainly a competent forum.

■ We are thus left with a considerable hodgepodge. Both core and non-core claims are asserted in this litigation, some of which easily belongs in bankruptcy court, such as claims litigation (assuming Fedders in fact wants to proceed to recover against Branded), determinations of lien validity, and equitable subordination claims. By the same token, a good portion of the lawsuit includes claims by Fedders against third parties that, though related to the bankruptcy case, is certainly non-core. There is little doubt that Fedders will be entitled to a jury, because of the nature of its causes of action, and therefore little doubt that the somewhat inefficient mechanism of section 157(c)(1) will have to be invoked (to say nothing of the considerable legal questions). It is an unfortunate result of the 1984 Amendments that remand is often indicated simply because too many unresolved legal issues remain to make trial in federal court efficient, even though the centralization of just such litigation was clearly Congress' intent when it enacted the Bankruptcy Reform Act of 1978. Nonetheless, it is those very uncertainties that lead this court to believe that a remand of this case is the most equitable disposition of the matter.

It remains then, to determine whether, once the case is remanded, Fedders should be permitted to proceed with the litigation.

## C. MOTION TO LIFT STAY

■ Fedders has not filed a claim in this bankruptcy case. Therefore, Fedders is not currently entitled to share in any distribution of assets of this estate. The automatic stay protects the estate from efforts to collect on claims outside the bankruptcy process and no reason has been presented why Fedders should be granted any exception from that protection. It is merely one more creditor trying to recover from the limited assets of a bankruptcy estate, and its claim has no greater dignity than that of any other unsecured creditor of the estate. Its motion for relief from stay, to the extent that Fedders seeks to recover on a claim against Branded, must be denied.

That is only the beginning of the analysis however. Fedders maintains that it seeks to recover on a constructive trust theory, premised on the notion that it is merely reclaiming what is its property, as opposed to property of the estate. To the extent that its request for relief against Branded is thus delimited, the stay can be modified to permit Fedders to proceed. As soon as Fedders attempts to obtain affirmative relief against Branded beyond that, however, it would be in violation of the automatic stay and subject to contempt proceedings in this court.

If Fedders wants now to maintain that it *does* want affirmative relief against Branded, then the court must reconsider its decision to remand, for then the nature of the proceeding is claims adjudication, a core proceeding which easily and properly belongs in *this* court, not state court. What is more, should Fedders file a proof of claim in this proceeding (as it would have to if it wants to proceed with litigating a "claim" against Branded), Fedders would also forfeit its jury trial rights, making retention of the case by this court that much easier. *See Langenkamp v. Culp,* 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990).

Fedders is thus put to a Hobson's choice. It can either substantially trim down the relief it seeks in its lawsuit, and enjoy the advantages of litigating in state court, or it can pursue more complete·relief, but find itself litigating in federal court. It is up to

Fedders to make its choice.[26]

### CONCLUSION

For the reasons stated herein, the court concludes that it should GRANT Fedders' Motion for Remand, and GRANT IN PART Fedders' Motion to Lift Stay. The court concludes that it should DENY the Motion to Sever, as well as the Motion to Abstain. A separate Order to that effect will be entered by the court.

---

**26.** No relief from stay is needed to pursue actions against parties other than Branded. Branded of course does not need relief from stay to pursue its counterclaims against Fedders. Fedders is not granted relief from stay to pursue its claims against Branded by way of setoff or recoupment, at least not without filing a proof of claim in this bankruptcy case first (and thereby submitting itself to the jurisdiction of this court).