**In re ADELPHIA COMMUNICATIONS CORP., et al., Debtors.**

**ML Media Partners, LP, Plaintiff,**

**v.**

**Century/ML Cable Venture, Adelphia Communications Corp., Century Communications Corp., and Highland Holdings, Defendants.**

Bankruptcy No. 02–41729 (REG).
Adversary No. 02–02544.

United States Bankruptcy Court,
S.D. New York.

Nov. 8, 2002.

Proskauer Rose LLP, by Bradley I. Ruskin, Esq., Jeffery W. Levitan, Esq., New York City, for plaintiff ML Media Partners, LP.

Willkie, Farr & Gallagher, by Roger D. Netzer, Esq., Michael W. Leahy, Esq., Shelly C. Chapman, Esq., New York City, for defendants Adelphia Communication Corp. and Century Communications Corp.

Daniel J. Aaron, P.C., by Daniel J. Aaron, Esq., New York City, for defendant Century/ML Cable Venture.

Dilworth Paxson, LLP, by Lawrence G. McMichael, Esq., Maura E. Fay, Esq.,

Philadelphia, PA, for defendant Highland Holdings.

### DECISION ON MOTION FOR PARTIAL REMAND AND ABSTENTION

ROBERT E. GERBER, Bankruptcy Judge.

ML Media Partners, L.P. ("ML Media"), the plaintiff in the above-captioned adversary proceeding (one of two related adversary proceedings that were removed to this Court from state court after a chapter 11 filing by Century Communications Corp. ("Century"), one of the four defendants here) moves to remand to state court two of its seven causes of action—the claims ML Media asserts against the two of the four defendants which, at the time of filing of the motion, were not chapter 11 debtors: Century/ML Cable Venture (the "Joint Venture") and Highland Holdings, Inc. ("Highland"). ML Media argues in favor of remand that:

(1) this Court lacks subject matter jurisdiction over ML Media's claims against the Joint Venture and Highland, under the relevant jurisdictional statute, 28 U.S.C. § 1334(b);

(2) this Court should abstain from hearing those claims, based on the jurisdictional statute's permissive and mandatory abstention provisions, 28 U.S.C. §§ 1334(c)(1) and (c)(2), respectively; and

(3) this Court should remand this adversary proceeding, on equitable grounds, under the "equitable remand" provision of the relevant removal statute, 28 U.S.C. § 1452(b).

For the reasons that follow, the Court concludes that:

(1) it has subject matter jurisdiction to adjudicate ML Media's claims against each of the Joint Venture and Highland;

(2) it should hold, as have the majority of the courts in this district, that mandatory abstention is inapplicable in cases, like this one, where a state court action was removed to the bankruptcy court, and there is no other similar state court action currently pending;[1] and

(3) remand on equitable grounds is inappropriate.

Accordingly, ML Media's motion is denied, with respect to each of the Joint Venture and Highland. The following are the Court's Findings of Fact, Conclusions of Law, and bases for the exercise of its discretion in connection with the motion.

### Facts

*The Removed Actions*

This adversary proceeding is before the Court under the umbrella of what are now the jointly administered chapter 11 cases of Adelphia Communications Corporation ("Adelphia"). Century, an indirect subsidiary of Adelphia, and one of the Debtors in the Adelphia cases—in fact, the first of what are now the Adelphia Debtors to file

---

1. The Court has no need to decide whether that analysis applies equally to discretionary abstention, as grounds for that analysis would not materially differ from those considered in connection with equitable remand, which the Court plainly would have the ability, and responsibility, to decide. *See Nemsa Establishment, S.A. v. Viral Testing Systems Corp.* 1995 WL 489711 at *9 (S.D.N.Y.1995) (Preska, J.) (*Nemsa*) (if abstention under § 1334(c)(1) in removed actions, where there is no alternate state court action, does apply, "then I must consider virtually the same factors as I did in connection with the motion to remand pursuant to § 1452(b)"); *In re Riverside Nursing Home,* 144 B.R. 951, 957 (S.D.N.Y.1992) (Schwartzberg, J.) ("[t]he equitable grounds that warrant a decision to remand under 28 U.S.C. § 1452(b) are similar to the factors that authorize abstention under 28 U.S.C. § 1334(c).").

a petition in this Court[2]—removed this and another state court action from the commercial part of the Supreme Court of the State of New York (Hon. Ira Gammerman, J.S.C.) to this Court.

The first of the two removed actions (the "Initial Action"),[3] which was commenced in March 2000, was brought by ML Media against Century, Adelphia, and Arahova Communications, Inc. ("Arahova"), another Adelphia subsidiary and another of the Debtors in these cases. The action that now comprises this adversary proceeding[4] —the second of the two removed actions, which involves an agreement under which claims in the Initial Action were settled— was initially brought by ML Media against the Joint Venture, Adelphia and Highland. Upon amendment of the complaint after removal to this Court, Century was named as a defendant in this action as well. As described below, this action involves an agreement, a "Leveraged Recapitalization Agreement," dated December 13, 2001 (the "Recap Agreement"), which, if its terms had been fully performed, would have settled the Initial Action. This action (the "Recap Agreement Action") was filed in state court on June 12, 2002, two days after Century filed its petition with this Court. The next day, June 13, 2002, Century removed both the Initial Action and the Recap Agreement Action to this Court.

## The Joint Venture

Plaintiff ML Media and defendant Century each hold a 50% interest in the Joint Venture, which (1) owns and operates a cable system in Puerto Rico and (2) owns all outstanding stock of a subsidiary also owning and operating a cable system in Puerto Rico (the "Systems"). Century was acquired by Adelphia in 1999, and is now an indirect subsidiary of Adelphia. Adelphia has had management control over the Systems owned by the Joint Venture, and has received a management fee, pursuant to a management agreement, for its efforts; though ML Media contends that Adelphia forfeited its right to continue as manager, for reasons set forth below, Adelphia has continued to serve as manager. Disputes arose between ML Media and Adelphia and/or Century with respect to the management of the Joint Venture, leading to the filing of the Initial Action.

## The Recap Agreement

The parties settled the Initial Action, in which a number of findings adverse to Adelphia had been made by Justice Gammerman, by executing the Recap Agreement. The parties to the Recap Agreement were ML Media, the Joint Venture, Century, Adelphia, and Highland.[5]

Under the terms of the Recap Agreement, the Joint Venture obligated itself to redeem ML Media's share of the Joint

**2.** Previously, another "Adelphia" entity, Adelphia Business Solutions, Inc. (whose ticker symbol was "ABIZ," and which is frequently referred to as such), which was a former Adelphia subsidiary that was the subject of a spin-off to Adelphia shareholders, filed a chapter 11 case in the Southern District of New York, which was earlier assigned to this Court. The Adelphia cases were filed as related cases here, presumably at least in part as a consequence of the extent to which their business was enmeshed with that of their former affiliate ABIZ, without objection by any party-in-interest in either of the ABIZ or Adelphia cases. At least so far, ABIZ does

not appear to have any role or interest in this dispute.

**3.** Adv. Proc. No. 02–2543 (previously Supreme Court, New York Co., Index No. 601298/00).

**4.** Adv. Proc. No. 02–2544 (previously Supreme Court, New York Co., Index No. 602155/02).

**5.** Affidavit of Elizabeth McNey Yates, dated June 12, 2002 (Yates Aff.), Exh. A (Recap Agmt), at page 1.

Venture (the "ML Media Share") on September 30, 2002 subject to acceleration (the "Closing Date"), as discussed below, for a price, subject to upward adjustments, of $275 million.[6] Highland obligated itself to arrange for the Joint Venture to obtain up to $300 million of debt financing in order to finance the redemption of the ML Media Share,[7] with, Highland, Adelphia and Century jointly and severally liable to provide the Joint Venture with sufficient funds to pay interest on any indebtedness incurred in connection with the redemption financing.[8]

However, the Recap Agreement further provided that Adelphia was required to purchase the ML Media Share, on the next business day after the Closing Date if the Joint Venture failed to close on its obligation to buy out the ML Media Share for any reason.[9] As further security for the sums that would have to be paid to ML Media under the Recap Agreement, ML Media was granted a security interest in Century's 50% interest in the Joint Venture.[10]

*Acceleration Events under the Recap Agreement*

The September 30 Closing Date in the Recap Agreement was subject to acceleration for a number of reasons ("Acceleration Events"), two of which ML Media has asserted to have taken place. Allegations with respect to the Acceleration Events thus play an important role in the Recap Action.

*Change of Control Provisions*

With respect to the first—referred to in shorthand as the "Change of Control Provisions," two sections of the Recap Agreement, taken together, would give ML Media the right to redemption prior to September 30. Section 3.3 of the Recap Agreement provided, in relevant part:

> *Acceleration of the Closing Date.* Notwithstanding the provisions of section 3.1 [providing for a September 30, 2002 Closing Date, subject to rights on the part of Adelphia or Highland to close earlier], the closing of the redemption or purchase under this agreement shall be held on the tenth business day after the occurrence of any of the following events ... (the Accelerated Closing Date) ...
>
> (a) the closing of any Transaction referred to in section 2.2(a).

Recap Agmt § 3.3(a).

Thus, a new, earlier, Closing Date for the redemption of the ML Media Share would occur 10 days after the "closing" of a "Transaction" referred to in Section 2.2(a). "Closing" as used in § 3.3 was not defined, but § 2.2(a) included, in its relatively lengthy language, a definition of "Transaction." Section 2.2(a) provided, in relevant part:

> The purchase price provided for in section 2.1 shall be subject to increase if (i) pursuant to a transaction initiated or an agreement executed prior to the Closing Date, there *is any change in control of Adelphia (i.e., any transaction that results in control of Adelphia by any individual, entity or group other than the Rigas family)....* Promptly after execution of the agreement or agreements relating to *any transaction referred to in this section 2.2(a) (referred to as the "Transaction")*, Adelphia shall give Seller notice of the Transaction or proposed Transaction and shall furnish to Seller

6. Recap Agmt at § 2.1.

7. Recap Agmt at § 8.8(a).

8. Recap Agmt at § 8.8(b).

9. Recap Agmt at § 1.2.

10. Yates Aff., Exh. D ("Security and Pledge Agreement"), at pages 1–2.

complete and accurate information with respect to the terms of the Transaction or proposed Transaction, together with copies of all agreements and other documents executed in connection with the Transaction.

(Emphasis added; references to types of transactions not alleged to be relevant are omitted).

In connection with widely reported allegations as to mismanagement of Adelphia by members of the Rigas family and allegations as to responsibility for transactions under which Adelphia became liable for borrowings for the benefit of Rigas family members ("Co Borrowing Agreements"), Adelphia and members of the Rigas family entered into an agreement, dated May 23, 2002 (the "May 2002 Rigas Family Agreement"),[11] whose interpretation and significance the parties dispute. It provided, in part:

1. The Rigas Family members (John Rigas, Tim Rigas, James Rigas and Michael Rigas, collectively with the entities directly or indirectly owned or controlled thereby, the "Rigas Family") will resign immediately from the Board of Directors of Adelphia. The Rigas Family members may designate two non-family members to be appointed to the Board until the earlier of December 31, 2006, the sale of the Family Cable Operations, or the repayment of the Rigas Family's obligations.

2. All Rigas Family members resign as officers of Adelphia effective immediately.

3. All Stock owned by the Rigas Family will be placed in a voting trust until all obligations of the Rigas Family to the Company for loans, advances, or borrowings under the co-borrowing agreements or otherwise are satisfied. . . .

The May 2002 Rigas Family Agreement further provided for a considerable array of additional matters, many of which would take place in the future. It further stated:

13. The parties agree, intending to be legally bound, to the foregoing. The parties acknowledge that the implementation of this agreement will require the preparation and execution of definitive documentation and the approval, consent or other action of third parties. The parties will act in good faith and use their commercially reasonable efforts, separately and in cooperation with each other, to implement this agreement. To the extent the parties are not able to agree on definitive documentation of this agreement, the parties agree to submit to binding arbitration pursuant to the rules of the American Arbitration Association to resolve the terms of the definitive documentation of this agreement.

A press release issued by Adelphia, upon which ML Media relies, provided, in part, that a special committee of Adelphia's Board "announced today that the Rigas family . . . has agreed to relinquish control of the Company. . . . "[12]

While it appears to be undisputed that if the requirements of §§ 3.3 and 2.2(a) were satisfied, there would be an acceleration of the Closing Date (and hence the duty, under the Recap Agreement, to proceed with the redemption of the ML Media Share), the parties are in dispute, based on differing readings of §§ 3.3 and 2.2(a), as to whether the acceleration provisions were triggered as a consequence of the execution of the May 2002 Rigas Family

11. Debtor's and Adelphia's Emergency Motion to Enforce the Automatic Stay to Enjoin Threatened Disbursement of Escrow Deposit. Exh. 4.

12. Yates Aff., Exh. H, Press Release, dated May 23, 2002.

Agreement, or events that took place on or about that day. ML Media argues that a change of control took place at that time, and that the Closing Date was accelerated to ten business days later, June 7, 2002.[13] Adelphia's obligation to purchase ML Media's interest in the event that the Joint Venture failed to redeem ML Media's share, in ML Media's view, was thus triggered on June 10, 2002.[14] The defendants dispute all of these assertions.

*Cross–Default Provisions*

The second Acceleration Event that has been alleged to exist in this action was based on provisions in the Recap Agreement that could provide for acceleration if Adelphia or any of its subsidiaries had a payment default on any indebtedness in excess of $50 million.[15] ML Media asserts that the requisite defaults on other indebtedness occurred on June 17, 2002; that the Closing Date was thus accelerated to July 1, 2002; and that Adelphia, in turn, became obligated to redeem the ML Media Share on July 2, 2002.[16] The defendants do not dispute the underlying defaults, but they contend that ML Media has failed to take into account permitted cure periods, which would exist under their (but not ML Media's) reading of the Recap Agreement. They also argue that the Recap Agreement is an executory contract, which defendants Adelphia and Century still have the ability to assume or reject.

*Other Relevant Provisions*

If there was no Acceleration Event, the duties on the part of the defendants to redeem the ML Media Joint Venture Share matured on September 30 and October 1, respectively, times that had not yet passed on the day of oral argument, but which came and went about a week later.

Section 8.5 of the Recap Agreement provides, with respect to indemnification of ML Media upon default:

> If the closing does not occur and if Buyer [the Joint Venture], Adelphia, Century or Highland defaults in the performance of any of its obligations under this agreement, Adelphia, Century and Highland jointly and severally shall indemnify and hold harmless Seller [ML Media] against all loss, liability, damage or expense incurred by Seller as a result of that default, including, but not limited to, legal fees and expenses and other out-of-pocket costs incurred by Seller in connection with any dispute as to the default and in connection with the enforcement of (or the taking or contemplating of steps to enforce) its rights under this agreement, the Security and Pledge Agreement referred to in section 2.4, and under any other agreement executed in connection with the execution and delivery of this agreement.

(Recap Agreement § 8.5).[17]

The Recap Agreement provided that if the Closing Date passed (either as sched-

---

**13.** First Amended Complaint in Adv. Proc. No. 02–2544 ("Amended Complaint") at ¶¶ 5–6.

**14.** Amended Complaint at ¶ 6.

**15.** Recap Agmt at § 3.3(b).

**16.** Amended Complaint at ¶ 7.

**17.** Highland argues that under another provision of the Recap Agreement, § 8.4, Highland is obligated "to pay a portion of the same

legal fees described in section 8.5." That obligation emerges from § 8.4(b) of the Recap Agreement, which provides that "Highland shall pay to Seller [ML Media] $1.1 million to reimburse Seller for legal fees and expenses of Proskauer Rose LLP." If Highland were to satisfy this obligation, it would reduce the amount to which ML Media would be entitled from the other defendants, the Joint Venture, Century and Adelphia.

uled or by reason of an Acceleration Event) without the closing taking place, ML Media would have the right to take over the management of the Joint Venture on the next business day after the Joint Venture failed to redeem the ML Media Share and Adelphia then failed to purchase the ML Media Share.

*ML Media's Claims*

ML Media asserts that two separate Acceleration Events have occurred, and that each of the Defendants, in one or more ways, has breached the Recap Agreement. ML Media brought this action, i.e., the Recap Agreement Action, initially in state court, seeking specific performance, monetary damages and declaratory and injunctive relief to enforce its rights under the Recap Agreement. ML Media alleges breaches of the Recap Agreement, at the least:

(a) on the part of the Joint Venture for the failure to redeem the ML Media Share after the two separate Acceleration Events that are alleged now to have occurred;

(b) on the part of Adelphia for the failure to redeem the ML Media Share on the business day after the Joint Venture was allegedly required to do so, and by reason of the failure to take all necessary steps to turn over management of the Systems to ML Media;

(c) on the part of Century, by reason of the failure to take the steps necessary to turn over management of the Systems to ML Media; and

(d) on the part of Highland by reason of the failure to arrange financing for the redemption; to reimburse ML Me-

dia for the $1.1 million in legal fees, under Recap Agreement § 8.4(b); and to indemnify ML Media, under Recap Agreement § 8.5 against for ML Media's loss-in an amount which by reason of the failure of the Joint Venture and Adelphia to pay the $275 million on redemption, would be equal, at the least, to $275 million.

*Prior Proceedings in this Action*

Century filed its chapter 11 petition on June 10, 2002,[18] about two weeks before the filing of the remainder of Adelphia's jointly administered chapter 11 cases, which were filed on June 25.[19] Just before the June 10 filing of Century's chapter 11 petition, Adelphia and Century had moved for a Temporary Restraining Order (TRO) and a preliminary injunction in the Initial Action before Justice Gammerman to protect their interests with respect to the Joint Venture. However, they withdrew their request for the TRO after hearing the condition under which Justice Gammerman would be willing to grant the TRO—that Adelphia, Century and Arahova "rescind all agreements relating to a change of control of any of [them]."[20] A hearing on the preliminary injunction motion in the state court was set for June 13, and on June 12, plaintiff ML Media filed its own motion for a TRO and preliminary injunction with Justice Gammerman (seeking to step in as manger, by reason of the alleged change of control), who set both motions for hearing on June 14.[21]

On June 13, just before any of the motions would be heard by Justice Gammerman, both state court actions were re-

---

**18.** Case No. 02–12834.

**19.** The lead case in the Adelphia cases is Case No. 02–41729. Century's case is now also jointly administered under Adelphia's lead case.

**20.** Proskauer Rose LLP letter, dated June 14, 2002, at page 1.

**21.** *Id.* at 2.

moved by defendant Century to this Court. On June 14, 2002, ML Media renewed its efforts to get the relief it had requested in the state court by bringing the same requests to this Court. After a hearing before this Court, ML Media's request to take over as manager of the Systems was denied, principally by reason of concerns on this Court's part as to irreparable injury and a balancing of the hardships to each party.

However, while Century had won the first battle in this Court, it lost the next. On June 17, Century brought an "Emergency Motion to Reinforce the Automatic Stay to Enjoin Threatened Disbursement of Escrow Agreement" (the "Century Escrow Motion"), attempting to enjoin the disbursement of $10 million that had been placed in escrow by Highland, which could be drawn down on in by ML Media in the event of an alleged event of default. For reasons related to limitations on the power of a bankruptcy court to enjoin a drawdown on funds that had been placed in escrow (in contrast to a determination as to the merits of the underlying dispute),

this Court denied Century's motion, and permitted disbursement of the $10 million to ML Media.[22]

On July 3, 2002, ML Media filed its First Amended Complaint, which added Century as a defendant and set forth with specificity, and individually, its claims against each of the Defendants.[23] In conjunction with filing the Amended Complaint, ML Media filed the motion that is the topic of this decision—Motion for Partial Remand and Abstention as to Non-Debtor Defendants.[24] The motion was then extensively briefed and argued.[25]

Thereafter, the Joint Venture filed its own chapter 11 petition, making it too a debtor in this Court.[26] ML Media has disputed the propriety of that filing, however, and has moved to dismiss it, under Bankruptcy Code section 1112(b), for cause.

### Discussion

As noted at the outset, ML Media's motion raises three principal issues with respect to the remand of its claims against the Joint Venture and Highland.[27] The claims against each of those entities raise

22. This $10 million would, of course, be a credit against any obligations under the Recap Agreement.

23. The defendants in this action are now the Joint Venture, Century, Adelphia and Highland (collectively, the "Defendants"). *See* Amended Cmplt., Docket No. 13.

24. Docket No. 18 ("ML Media Opening Br.").

25. *See* Docket No. 22 ("Highland Opposition Br."); Docket No. 23 ("Debtors' Opposition Br."); Docket No. 27 ("Joint Venture Opposition Br."); Docket No. 33 ("ML Media Reply"); and Docket No. 39 ("Debtors' Sur Reply"). Additionally, both ML Media and Adelphia submitted post-hearing letters to the Court with respect to matters discussed in argument.

26. Case No. 02–14838.

27. A fourth issue does not, in the Court's view, require extensive discussion. The Court

assumes, without deciding, that it has the ability to remand or abstain with respect to a single cause of action, and/or the claims asserted against less than all defendants, even if it has determined that it should not do so with respect to *all* of the claims. *See Indiana Lumbermen's Mutual Ins. Co. v. Rusty Jones, Inc. (In re Rusty Jones, Inc.),* 124 B.R. 774, 780 (Bankr.N.D.Ill.1991) (*"Rusty Jones"*) (acknowledging that partial abstention was theoretically possible, but arguably dictum, as court elected not to do so). *See Nemsa,* 1995 WL 489711 at *8 (declining to remand claims asserted against non-debtor defendants, since they were intertwined with claims against the debtor, but so holding as an exercise of court discretion, and not because of any stated view that the court lacked power to do so). In light of the analysis set forth below, the Court does not need to address this issue.

non-identical issues, and they will be separately addressed, after the discussion of principles applicable to both.

## I.
### Subject Matter Jurisdiction

As noted above, ML Media contends that the Court lacks subject matter jurisdiction over its claims against the Joint Venture and Highland. Section 1334 of the Judicial Code, 28 U.S.C. § 1334, defines the subject matter of the district courts (and hence the bankruptcy courts) with respect to the exercise of their bankruptcy jurisdiction.[28] After providing, in its subsection (a), that the district courts have jurisdiction (and, indeed, exclusive jurisdiction) over *cases* under title 11 (a matter not relevant here),[29] it provides, in relevant part, with respect to *proceedings* (which include, in addition to contested matters in cases, adversary proceedings like this action):

> (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

28 U.S.C. § 1334(b). The three types of jurisdiction that district (and hence bankruptcy) courts thus may exercise are "arising under" and "arising in" jurisdiction (which the Court regards as species of federal question jurisdiction), and "related to" jurisdiction, which is the argued basis here, and whose presence is in dispute.

### A.
### Standards With Respect to Related To Jurisdiction

As Chief Judge Mukasey of the district court noted when considering an earlier "related to" issue under section 1334(b), the Third Circuit has articulated what has become the prevailing definition of "related to" jurisdiction:

> [A] civil proceeding is related to bankruptcy [if] . . . the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy [internal citations omitted]. Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to the bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any

---

**28.** The provisions of 28 U.S.C. § 1334, and principles laid out in the caselaw construing it, apply equally to district judges and bankruptcy judges hearing matters like those here. There are, in addition, limits on the power of bankruptcy judges, who are Article I judges, to decide controversies that district judges, who are Article III judges, could hear under 28 U.S.C. § 1334–as discussed in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (*"Marathon"*), and 28 U.S.C. § 157, which governs the exercise of judicial power by bankruptcy judges in the light of the *Marathon* concerns. *See PSINet, Inc. v. Cisco Systems Capital Corp. (In re PSINet, Inc.)*, 271 B.R. 1, 9–10 (Bankr.S.D.N.Y. 2001) (Gerber, J.) (explaining the law in this area, and concluding, among other things, that an Article I bankruptcy judge could determine the issues presented there).

**29.** Title 11 is, of course, the Bankruptcy Code. "Case" is a word of art in bankruptcy, referring to that which is commenced by the filing of a petition under sections 301 through 304 under the Bankruptcy Code—what Century filed on June 10, and what Adelphia filed on June 25. It is the modern way of referring to what was commonly referred to as a "proceeding" under the former Bankruptcy Act. Now, by contrast, a "proceeding" is a matter that comes up in a "case," or is a separate proceeding (like an adversary proceeding) brought in connection with a "case."

way impacts upon the handling and administration of the bankrupt estate.

*Weisman v. Southeast Hotel Properties Ltd. Partnership,* 1992 WL 131080, at *3 (S.D.N.Y.1992) (Mukasey, C.J.) ("*Weisman*") (quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984), and finding subject matter jurisdiction to exist); *accord Hunnicutt Co. v. TJX Companies, Inc. (In re Ames Department Stores, Inc.),* 190 B.R. 157, 160 (S.D.N.Y.1995) (Koeltl, J.) ("*Hunnicutt*") (also finding subject matter jurisdiction to exist). This test is often referred to as the "conceivable effects" test, or the "*Pacor* test."

▮ Although in an earlier decision, the Second Circuit had used words suggesting an arguably stricter test, dismissing a case for lack of subject matter jurisdiction and stating that there was no showing that the action had any "significant connection" to the bankruptcy case, see *In re Turner,* 724 F.2d 338, 341 (2d Cir.1983), a later decision by the Second Circuit construing section 1334(b) indicates that now the Second Circuit also subscribes to the *Pacor* test. *See In re Cuyahoga Equipment Corp.,* 980 F.2d 110 (2d Cir.1992). In *Cuyahoga Equipment,* the Second Circuit stated that in determining whether there is the "significant connection" that had earlier been articulated as the standard, the test is "conceivable effect":

[T]he test for determining whether litigation has a significant connection with a pending bankruptcy proceeding is whether its outcome would have any "conceivable effect" on the bankrupt estate. If that question is answered affirmatively, the litigation falls within the "related to" jurisdiction of the bankruptcy court.

980 F.2d at 114. *See also Hunnicutt,* 190 B.R. at 160 (considering whether the formulation in *Turner* was any different than that of *Pacor* and *Cuyahoga Equipment,* and concluding that "it is now clear that there is no difference"). This Court agrees with the analysis in *Hunnicutt* that there is no difference,[30] and that in the Second Circuit, as elsewhere, the existence of a "conceivable effect" on the bankruptcy now establishes "related to" jurisdiction under Section 1334(b). *See Back v. AM General Corp. (In re Chateaugay Corp.),* 213 B.R. 633, 638 (S.D.N.Y.1997) (Baer, J.); *Bond Street Assocs. v. Ames Dep't Stores, Inc.,* 174 B.R. 28, 32 (S.D.N.Y.1994) (McKenna, J.); *Masterwear Corp. v. Rubin Baum Levin Constant & Friedman (In re Masterwear Corp.),* 241 B.R. 511, 515 (Bankr.S.D.N.Y.1999) (Bernstein, C.J.) ("*Masterwear*").

Using the *Cuyahoga Equipment* standard,[31] the Court now considers the extent

---

**30.** While in *Turner,* the Second Circuit had stated that a "significant connection" to the bankruptcy was lacking when it dismissed a debtor's cause of action against her landlord, Judge Mukasey noted in *Weisman* that "the outcome in *Turner* would remain unchanged whether the court intended the 'significant connection' language to be interpreted as expansively as the *Pacor* standard, or more narrowly." *Weisman,* 1992 WL 131080 at *3. This Court agrees. As "related to" jurisdiction would have been lacking in *Turner* irrespective of the test that was used, it appears that the Second Circuit had no occasion in *Turner* to address any distinction between the two standards, and that its use in *Turner* of

the words "significant connection," in contrast to "conceivable effect," cannot be regarded as holding.

**31.** Another basis for finding "related to" jurisdiction has been adopted in this district, finding "related to" jurisdiction where claims by a non-debtor against a non-debtor defendant were "intimately intertwined" with those asserted against the debtor. *See Nemsa,* 1995 WL 489711 at *6 (*citing Kelley v. Nodine (In re Salem Mortgage),* 783 F.2d 626 (6th Cir. 1986), and *Ameritrust v. Opti–Gage, Inc. (In re Opti–Gage, Inc.),* 128 B.R. 189 (Bankr. S.D.Ohio 1991)). In *Opti–Gage,* as the *Nemsa* court noted, it was held that:

to which ML Media's claims against each of the Joint Venture and Highland have a "conceivable effect" on the bankruptcy cases of Century and Adelphia.

## B.

### The Joint Venture

First, with respect to the Joint Venture (and even without taking into account the Joint Venture's recent chapter 11 filing),[32] the Court has no doubt whatsoever that it is has subject matter jurisdiction over ML Media's claims. ML Media plainly is correct when it notes that the property that it seeks to obtain by litigating against the Joint Venture is property of the Joint Venture itself, and not that of Century or Adelphia; that they are indeed distinct entities; and that property of a partnership in which a debtor has an interest is not property of the debtor itself. *See In re Minton Group*, 27 B.R. 385 (Bankr.S.D.N.Y.1983) (Schwartzberg, J.), *aff'd sub nom. Turner v. Lee (In re Minton Group, Inc.)*, 46 B.R. 222 (S.D.N.Y. 1985) (while a general partner held a property interest in the partnership's property, it did not own the underlying property itself). But that is less than a complete analysis. *See, e.g., Weisman, supra*, 1992 WL 131080, at *3 ("the proceeding need not necessarily be against the debtor or against the debtor's property"). ML Media's analysis fails sufficiently to address the other ways by which the bankruptcy estates of Debtors Century and Adelphia would be affected.[33]

The value of Debtor Century's *interest* in the Joint Venture, which *is* Debtor Century's property, would be affected, and dramatically so, by a judgment in the amount of $275 million[34] against the Joint Venture. In this Court's view, that would

---

[P]roceedings are "related to" bankruptcy cases not only where the outcome of the proceeding may conceivably have an effect upon the estate being administered, but also where parties are sufficiently intertwined with the debtor.

*1995 WL 489711* at *3 (quoting *Opti–Gage*, 128 B.R. at 195, which in turn was explaining *Salem Mortgage*).

This Court would be inclined to agree with the *Nemsa* analysis if it were required to reach the issue, but the Court does not need to do so, since the effect on the Debtors required under *Cuyahoga Equipment* is so clearly present here. *Nemsa* is nevertheless relevant with respect to other matters in this case as well, and is discussed further below, in connection with equitable remand.

**32.** As noted above, after the briefing and argument of this motion, the Joint Venture filed its own chapter 11 case, though ML Media has moved to dismiss the filing for cause. That motion has not yet been fully briefed, and has not been argued. If the Court were to deny the motion to dismiss, and the Joint Venture were to remain as a debtor, this Court's subject matter jurisdiction over ML Media's claims against the Joint Venture would be beyond dispute. However, under the circumstances, the Court considers it more appropriate to consider the matter on the facts that existed when ML Media's motion was briefed and argued-i.e., on the premise that the Joint Venture would not itself be a debtor under the Code.

**33.** For that reason, *Minton* is not relevant. In *Minton*, the trustee was trying to use his strong arm powers on behalf of a non-debtor limited partnership in which the debtor was a general partner, in order to avoid the recording of a mortgage on the assets of the non-debtor limited partnership after the debtor general partner's petition had been filed. Judge Schwartzberg ruled, hardly surprisingly, that what was the debtor's property, and what was the partnership's property, were not the same, and that the trustee's strong-arm powers did not extend to property of the partnership, as the debtor's interest in the partnership was limited to an ownership interest. The issue in *Minton* did not involve "related to" jurisdiction at all.

**34.** The $275 million is subject to upward adjustment, but for purposes of discussion, reference to the $275 million is sufficient.

not just represent a substitution of liabilities on the part of the Joint Venture with no effect on the value of the interests therein; it would additionally affect the Joint Venture's ability to continue as a going concern, and thus the value of the respective interests-whether the Joint Venture paid the judgment (though its ability to do so may be doubtful) and thereby reduced its assets by $275 million, or (as is more likely) the Joint Venture were forced to deal with the consequences of a judgment of that size hanging over it.

Additionally, a judgment against the Joint Venture as a consequence of the default of the Joint Venture would seemingly trigger the provisions of Recap Agreement § 8.5, making Adelphia and Century jointly and severally liable for ML Media's damages and expenses incurred as a consequence of that default. Under that section, Adelphia and Century would be liable for ML Media's legal fees and expenses, and, at least arguably, the judgment, to the extent the Joint Venture did not pay it.

Additionally, a decision in the state court determining that an Acceleration Event has taken place would also have the effect, or potential effect, of triggering the loss of Adelphia's ability to manage the Joint Venture under Recap Agreement § 1.4—which might or might not be the appropriate result, but which in either event would

have much more than a "conceivable effect" on a bankruptcy debtor. Putting aside the provisions of Recap Agreement § 1.4, a judgment against the Joint Venture in the amount of $275 million likely also would have an effect on the Joint Venture's ability to pay Adelphia for the continued management of the Joint Venture—apart from the provisions in Recap Agreement § 1.4 providing for the termination of management rights upon a default after an Acceleration Event.[35]

These matters, particularly in the aggregate, cause this Court to believe that ML Media's claims against the Joint Venture would have much more than a "conceivable effect" on the Debtors Century and Adelphia, and that ML Media's claims are related to the Century and Adelphia chapter 11 cases.

### C.

#### Highland

■ ML Media also asserts that this Court lacks subject matter jurisdiction over ML Media's claims against Highland. Adelphia and Century do not have as overwhelming an interest in ML Media's claims against Highland, a partnership in which members of the Rigas Family are members. However, here too the Court finds that the requisite "conceivable effect" exists.

---

**35.** Counsel for the Joint Venture has noted that the Joint Venture is likely to assert, in connection with any effort to recover the $275 million from the Joint Venture, a fraudulent conveyance defense—given that, before the Recap Agreement—a "leveraged" recapitalization agreement—the Joint Venture had no liability for the $275 million, and its assets were put on the line to buy a piece of itself, and to satisfy obligations of others, i.e., Adelphia, Century, and (arguably) Highland. However, while the assertion of defenses under the Bankruptcy Code would be relevant to this Court's determination of equitable remand,

the Court does not regard it as relevant to subject matter jurisdiction. As counsel for Adelphia and Century noted in a post-argument letter, a counterclaim or defense based on federal law, including bankruptcy law, does not provide an independent basis for subject matter jurisdiction. *See Holmes Group, Inc. v. Vornado Air Circulation Systems,* 535 U.S. 826, 122 S.Ct. 1889, 1893–1894, 153 L.Ed.2d 13 (2002); *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987); *Property Clerk v. Fyfe,* 197 F.Supp.2d 39, 41 (S.D.N.Y.2002).

As noted above, under § 8.5 of the Recap Agreement, Adelphia and Century became jointly and severally liable for losses suffered by ML Media as a consequence of the breach of the Recap Agreement by any of the parties thereto. Just as Adelphia and Century would be liable for breaches by the Joint Venture, Adelphia and Century would be liable for breaches by Highland; a determination that Highland had breached would trigger liability on the part of Adelphia and Century under § 8.5. This would have the requisite effect on the debtors to satisfy the requirements of *Cuyahoga Equipment. See Hunnicutt, supra,* 190 B.R. at 160 (negative effect on estate satisfies requirement).

Likewise, payment by Highland on account of its joint and several liability, under § 8.5, or under its separate covenant to pay $1.1 million of ML Media's legal fees and expenses under § 8.4(b), as ML Media seeks in this action, would reduce the amount owing by the remaining defendants under § 8.5. Once more this would have the requisite effect on the estates of the two chapter 11 debtors Adelphia and Century. *See Hunnicutt, supra,* 190 B.R. at 160 (positive effect on estate also satisfies requirement); *see also In re Titan Energy, Inc.,* 837 F.2d 325, 329–330 (8th Cir.1988) (bankruptcy court had jurisdiction over claims by non-debtor against an insurance company, as non-debtor's recovery against the insurance company would reduce liabilities of bankruptcy estate).[36]

## II.

### Abstention

Section 1334(c)(2) of the Judicial Code, the so-called "mandatory abstention" provision with respect to the district courts' exercise of their bankruptcy jurisdiction, provides that:

Upon [1] timely motion of a party [2] in a proceeding based upon a State law claim or State law cause of action, [3] related to a case under title 11 but not arising under title 11 or arising in a case under title 11, [4] with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court *shall* abstain from hearing such proceeding if [5] an action is commenced, and [6] can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2) (emphasis added). As the statute's use of the word "shall" indicates, this provision—which is in contrast to the first provision of section 1334(c), which authorizes the district court

---

**36.** Another matter with a conceivable effect on debtor's estates—not raised by Highland, for understandable reasons—is a potential race for assets of Highland and its partners. ML Media is not the only entity with claims against Highland. The Debtors themselves have asserted claims against Highland, as set forth in a RICO action against Highland and members of the Rigas family that was filed by Adelphia as another adversary proceeding in this Court. *See* complaint in *Adelphia Communications Corp. v. Rigas,* Adv. Pro. No. 02–8051 (filed 7/25/02, Docket # 1). (Defendants in that action have sought withdrawal of the reference, in motions that, so far as this Court is aware, are pending before the district court.) The exact amount sought is not stated in the complaint (either before or after the trebling that is sought), but the Court believes it to be substantial, probably in the billions of dollars.

If, as the Court imagines, Highland's assets are not limitless, judgment and execution against Highland in the amount of $275 million could deplete assets that might otherwise be available to satisfy any judgment that Adelphia might obtain, which could have a material adverse effect on the Adelphia estate. Ultimately, however, this Court does not need to reach this issue either, in light of the clear effect on Adelphia and Century that the matters described above would have.

to abstain, in its discretion, when such is in the interests of justice or comity [37]—*compels* abstention when the statutory requirements are satisfied.

■ A recent decision of the district court in this district, examining the statutory requirements in depth, has listed the factors that must all be met in determining whether mandatory abstention is required.

The party seeking mandatory abstention must show that: (1) the abstention motion was "timely" brought; (2) the action is based upon a state law claim; (3) the action is 'related to' a bankruptcy proceeding, as opposed to 'arising under' the Bankruptcy Code or 'arising in' a case under the Bankruptcy Code; (4) the sole federal jurisdiction for the action is Section 1334; (5) there is an action 'commenced' in state court; and (6) the action is capable of being 'timely adjudicated' in state court.

*Renaissance Cosmetics, Inc. v. Development Specialists Inc.*, 277 B.R. 5, 12 (S.D.N.Y.2002) (Scheindlin, J.) ("*Renaissance Cosmetics*").

■ Only the last two factors are subject to debate here, and the critical issue is Requirement # 5, that "an action is commenced" in state court.[38] Where, as here (and in many other cases), an action was once commenced in state court but has been removed to the federal court, and there no longer is an action pending in state court, there is dispute as to whether the mandatory abstention requirement applies, and whether remand—which is governed by a separate provision of Judicial Code, 28 U.S.C. § 1452 [39]—is thus required.

The cases are split on this issue, both nationally and in this district, and the two sides agree that the Second Circuit has not decided the issue.[40] Each side, understandably, relies on the cases in its favor, and makes the statutory and policy arguments tending to support its position. ML Media points to a number of cases, the bulk of which are outside this district, generally holding that mandatory abstention, and hence remand, is required even where a case has been removed and there is not a separate state court action for the federal court to abstain "in favor of".[41]

---

**37.** Section 1334(c)(1) provides:

Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

**38.** Requirement # 6, timely adjudication in the state court, would need to be addressed if, but only if, the Court concluded that Requirement # 5 is satisfied.

**39.** That section, captioned "Removal of claims related to bankruptcy cases," provides, in relevant part:

(a) A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

(b) The court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground. . . .

**40.** *See* ML Media Opening Br. at 16 n. 12; Adelphia/Century Answering Br. at 12.

**41.** Those cases, and others holding similarly, include *In re Southmark Corp.*, 163 F.3d 925, 929 (5th Cir.1999); *Robinson v. Michigan Consol. Gas Co., Inc.*, 918 F.2d 579, 584 n. 3 (6th Cir.1990); *Personette v. Kennedy (In re Midgard Corp.)*, 204 B.R. 764 (10th Cir. BAP 1997); *Gassman v. Gassman, Griper & Golodny*, 1997 WL 603439, at *1 (S.D.N.Y. Sept.30, 1997) (Owen, J); *Channel Bell Assocs. v. W.R. Grace & Co.*, 1992 WL 232085, at *5

Adelphia, Century, the Joint Venture and Highland point to other cases,[42] including the majority of the reported caselaw in the Southern District of New York,[43] holding to the contrary, and ruling that the requirements for mandatory abstention are not satisfied in removed cases where there is no other state court proceeding to which to defer. ML Media submits "that the better view is to apply the mandatory abstention doctrine in cases of removed actions".[44]

However, upon consideration of the issue, based on both this Court's belief that there should be consistency within this judicial district (even when the decisions of other judges in this district are not, strictly speaking, binding), and its independent consideration of the merits, this Court disagrees, and believes that it should rule in

accordance with the views expressed by Judges Mukasey, Sweet, Kaplan, Scheindlin, and Beatty in the Southern District of New York.

The most recent analysis of the law of this area in this district, Judge Scheindlin's decision in *Renaissance Cosmetics*, thoroughly discusses the caselaw (including the differences in views in this area), and evidences, in this Court's view, why the decisions in *Renaissance Cosmetics*, *Weisman*, *Arstk*, *Neuman*, *Ross*, and *666 Associates* represent the majority view in this district. The most important of those points, as Judge Scheindlin noted, are that first, section 1334(c) requires that a proceeding be pending in state court, and where there is but one state court proceeding at issue, that proceeding is no longer pending after removal, *see* 277 B.R. at 12,[45] and that

(S.D.N.Y. Aug.31, 1992) (Leisure, J.); *Covanta Onondaga Limited v. Onondaga County Resource Recovery Agency*, 281 B.R. 809, 815–816 (N.D.N.Y.2002) (Munson, J.); *Universal Well Svcs., Inc. v. Avoca Natural Gas Storage*, 222 B.R. 26, 31 (W.D.N.Y.1998) (Telesca, J.); *Bevilacqua v. Bevilacqua*, 208 B.R. 11, 16 (E.D.N.Y.1997) (Weinstein, J.) *Wheeling–Pittsburgh Corp. v. American Insurance Co.*, 267 B.R. 535, 540 (N.D.W.Va.2001) (Stamp, J.). ML Media also contends that the Second Circuit has indicated, in dicta, that it would agree, if the question were squarely presented, that abstention would be available in removed cases (ML Media Reply Br. at 13), citing *In re Cathedral of the Incarnation in Diocese of Long Island*, 99 F.3d 66, 69 (2d Cir.1996) ("*Cathedral of the Incarnation*"). This contention, which the Court finds to be unpersuasive, is discussed below.

42. Those cases, and others holding similarly, include *In re Lazar*, 237 F.3d 967 (9th Cir. 2001); *Renaissance Cosmetics*, 277 B.R. at 12–13; *Arstk, Inc. v. Audre Recognition Sys., Inc.*, 1996 WL 229883, at *4 (S.D.N.Y. May 7, 1996) (Kaplan, J); *Neuman v. Goldberg*, 159 B.R. 681, 687–688 (S.D.N.Y.1993) (Sweet, J.) ("*Neuman*"); *Weisman*, 1992 WL 131080 at *5; *In re Ross*, 64 B.R. 829, 834–835 (Bankr. S.D.N.Y.1986) (Beatty, J.); *Centrust Savings v. Chemical Bank (In re 666 Associates)*, 57 B.R.

8, 12 (Bankr.S.D.N.Y.1985) (Beatty, J) ("*666 Associates*"); *In re Montague Pipeline Technologies Corp.*, 209 B.R. 295, 304 (Bankr. E.D.N.Y.1997) (Duberstein, C. J.); *In re Duval County Ranch Co.*, 167 B.R. 848, 849 (Bankr. S.D.Tex.1994) (Schmidt, J.); *In re Branded Products, Inc.*, 154 B.R. 936, 939 (Bankr. W.D.Tex.1993) (Clark, J.); *In re Fairchild Aircraft Corp.*, 1990 WL 119650, *3 (Bankr. W.D.Tex. June 18, 1990) (Clark, J.); *In re Pacor, Inc.*, 72 B.R. 927, 931 (Bankr.E.D.Pa.) (Fox, J.), *aff'd*, 86 B.R. 808 (E.D.Pa.1987) (Giles, J.); *In re Micro Mart, Inc.*, 72 B.R. 63, 64 (Bankr.N.D.Ga.1987) (Kahn, J.)

43. *See Renaissance Cosmetics*, 277 B.R. at 12–13; *Arstk*, 1996 WL 229883 at *4; *Neuman*, 159 B.R. at 687 688; *Weisman*, 1992 WL 131080 at *5; *Ross*, 64 B.R. at 834–35; *666 Associates*, 57 B.R. at 12; *contra, Channel Bell*, 1992 WL 232085, at *5; *Gassman*, 1997 WL 603439, at *2.

44. ML Media Opening Br. at 16 n. 12.

45. As Judge Beatty of this Court noted in *666 Associates*:

The language of § 1334(c)(2) reflects that the mechanics are premised on the existence of two proceedings: one in the bankruptcy court and a second one in the

second, 28 U.S.C. § 1452(b), the remand statute, makes no mention of section 1334(c) abstention, thus indicating that the two doctrines should not be applied together. *Id.* (*quoting Montague Pipeline*, 209 B.R. at 304).[46]

Like Judge Beatty in *666 Associates*, this Court finds no anomaly in declining to apply § 1334(c)(2) to removed actions. Section 1452(b) gives the federal court the ability to send cases that should be heard in state court back to the state courts, in the exact context of actions that have been removed from the state court to the federal court. Though this Court has no occasion to decide whether Section 1334(c)(1) applies on remand motions, since the concerns of § 1334(c)(1) are fully addressed under § 1452(b), the Court notes that section 1334(c)(1)—which permits, but does not mandate, abstention in the interest of justice or comity with state courts or respect for state law—has a very different sentence and paragraph structure. It does not impose a requirement that there be a case commenced elsewhere.

The Court also notes that in each of *Renaissance Cosmetics*, see 277 B.R. at 13, and *Neuman*, see 159 B.R. at 688 n. 4, the courts recognized the existence of contrary authority, including authority in this district, and nevertheless came to the conclusion reached here.[47]

The Court therefore rules, in accordance with the bulk of the cases in this district, that mandatory abstention under § 1334(c)(2) is inapplicable unless there is

---

state court. Indeed if there were only one proceeding, and the court abstained with respect to it, nothing would go forward. In a removed action, there is perforce only one proceeding once removal has been made. This court concludes that § 1334(c)(2) is not applicable to a removed action.

*Id.* at 12; *see also Neuman*, 159 B.R. at 687–688 ("[t]he statutory scheme of § 1334 precludes the application of the mandatory abstention provision in § 1334(c)(2) to removed actions absent a parallel state case;" typographical error corrected); *cf. Kolinsky v. Russ*, 100 B.R. 695, 704 (Bankr. S.D.N.Y.1989) (Schwartzberg, J.) ("The prerequisite for mandatory abstention . . . is a pending state court case;" stated in context of consideration of § 1334(c)(2), but not on a motion for remand).

**46.** It is true that section 1334(c)(2) uses the word "commenced," rather than the word "pending," but it is also true, as Judge Beatty noted in *666 Associates*, that:

If Congress had intended that in considering whether to remand a removed action, the court should look to § 1334(c)(2) it would have been a simple matter to insert the appropriate cross-reference in § 1452(b), just as a cross-reference to § 1334 was added in § 1452(a). The absence of such a cross-reference is striking since removed actions would principally be state court actions and presumably be based on state law.

57 B.R. at 12.

**47.** While agreeing that the Second Circuit has not ruled on this issue, ML Media argues, in its reply brief, that the Second Circuit indicated in dicta, in *Cathedral of the Incarnation*, that if the question were squarely presented, abstention would be "available with regard to removed cases." (ML Media Reply Br. at 13). The words that the Second Circuit used in *Cathedral of the Incarnation* (and in a wholly different context) were that "Section 1334 commands the federal court to abstain from hearing certain suits related to bankruptcy proceedings, and § 1452(b) provides for the remand of such cases if removed to federal court." *See* 99 F.3d at 69. Judge Scheindlin considered the argued relevance of *Cathedral of the Incarnation* in *Renaissance Cosmetics*, see 277 B.R. at 13 n. 5, but noted that the decision in *Cathedral of the Incarnation* "did not address the question of whether section 1334 requires abstention when there is no parallel action pending in state court." *Id.* After review of *Cathedral of the Incarnation*, this Court likewise sees no indication that the Second Circuit considered this issue in the slightest, or that its language can fairly be regarded as any indication as to how it would address the issue presented here.

a separate state court proceeding to which the federal court can defer.

## III.

### Equitable Remand

ML Media further argues that the Court has the power under 28 U.S.C. § 1452(b) to remand on "any equitable ground," and that even if mandatory abstention (and hence remand) is not required, this Court should do so with respect to the claims against the Joint Venture and Highland in its discretion. The Court agrees that it has the power to do so, but determines, in its discretion, that such is inappropriate here.

■ As ML Media properly notes, 28 U.S.C. § 1452(b) provides, in relevant part:

The court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground....

The statute uses the word "may," and matters of this character are within the discretion of the district (and hence bankruptcy) court. While, if this Court were writing on a clean slate, it might prefer to use the more descriptive expression "discretionary remand," it considers it safer to use the more customary description for matters of this character, "equitable remand."

■ As ML Media also properly notes, caselaw informs the exercise of the Court's discretion in making determinations of this character. Factors identified as relevant to a determination as to whether to remand on equitable grounds under § 1452(b) are sometimes referred to as the "Drexel Factors," named after a decision in which they were articulated, Drexel Burnham Lambert Group, Inc. v. Vigilant Ins. Co. (In re Drexel Burnham Lambert Group, Inc.), 130 B.R. 405, 407 (S.D.N.Y. 1991) (Edelstein, J.), include:

(1) the effect on the efficient administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty or unsettled nature of the applicable state law; (4) comity; (5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (6) the existence of the right to a jury trial; and (7) prejudice to the involuntary removed defendants.

Renaissance Cosmetics, 277 B.R. at 14. See also Arstk, supra, 1996 WL 229883 at *5; In re Riverside Nursing Home, 144 B.R. 951, 956 (S.D.N.Y.1992) (Schwartzberg, J).

■ While the litigants here do not differ with respect to the applicable factors to be considered, they differ substantially with respect to the factors' application. Because the Court does not wholly agree with the analysis of those factors proffered by either side, it simply sets forth its own view of the applicability of the Drexel Factors.

### (1) Efficient Administration of the Estate

■ This factor, which the Court regards as one of the most important, strongly dictates keeping all of these cases here. ML Media has not sought remand of its claims against Adelphia and Century. The determination as to whether there has been an Acceleration Event is necessary for all defendants. It would likely be contrary to law, and unjust, to apply doctrines of res judicata or collateral estoppel against Adelphia and Century based on determinations in proceedings in which they were not parties in the state court. The same would be true with respect to applying those doctrines against the Joint Venture and Highland by reason of pro-

ceedings in this Court after they were no longer parties here. It is at least possible that debtor defendants and non-debtor defendants would want to cross-claim against each other. The issues are, as Judge Preska found in *Nemsa,* "inextricably intertwined," *see* 1995 WL 489711 at *8, and that reality (whether or not it provides an additional independent basis for subject matter jurisdiction) strongly counsels against separating the litigation as to the intertwined issues. There is no good reason, in this Court's view, to decide identical or nearly identical issues in two separate courts.

Similarly, to the extent that the relevant documents are ambiguous, and parol evidence will be taken, the evidence will be largely, if not entirely, the same for all. Discovery relating to the claims against all will overlap substantially, if not totally. Each of the defendants presently here will be required to produce documents (and at least in most cases, testimony) with respect to ML Media's claims against the others. There is no good reason, in this Court's view, to bifurcate that discovery, or to necessitate federal-state coordination of ongoing discovery needs in two separate courts. There are good reasons why the Judicial Panel on Multi–District Litigation routinely sends cases filed in different districts—but all in the federal courts—to a single forum for consolidated pretrial proceedings under 28 U.S.C. § 1407. Those very same reasons counsel restraint on the parts of courts like this one in taking actions that would materially impair the effective management of pretrial proceedings.

Other administration of justice considerations make the application of this factor even more lopsided. Each of the Joint Venture and the Debtor defendants, Adelphia and Century, has expressed an intention to assert as a defense that per-formance on the Recap Agreement would constitute a fraudulent conveyance. As noted above, such defenses, even if based on federal law, would not confer subject matter jurisdiction on this Court, but the potential interrelationship between such defenses and the contract claims would once again suggest that all claims and defenses be heard in a single forum. It would be illogical and inefficient for fraudulent conveyance defenses to be prosecuted in the state court, with respect to the Joint Venture, and also the federal court, with respect to debtors Adelphia and/or Century.

Then, as noted below, matters in the bankruptcy court, involving the assumption or rejection of the Recap Agreement under Bankruptcy Code section 365, reasonably may be expected to have a significant effect on the non-debtor defendants, especially if one of the debtor-defendants assumes the Recap Agreement, and cures the defaults under it.

### *(2) Extent to Which Issues of State Law Predominate*

The Court believes that issues of state law do indeed predominate with respect to the contract issues in dispute here, but it regards this as only a modest factor in ML Media's favor. Both the bankruptcy judges in this district, and the district judges here, address matters of state law on a regular basis. As Justice White noted in his dissent in *Marathon* (in comments with which neither the *Marathon* plurality nor the justices concurring with the result differed), "the bankruptcy judge is constantly enmeshed in state-law issues." 458 U.S. at 97, 102 S.Ct. 2858, 2885 (White, J., dissenting). And as Judge Sweet noted in *Neuman:*

> The fact that a complaint is based on state law causes of action does not mandate equitable abstention or remand,

particularly where the state law claims are not novel or complex. . . .

159 B.R. at 688.

### (3) Difficulty or Unsettled Nature of Applicable State Law

Here the applicable law is not particularly unsettled, and this factor is not of material significance here. ML Media, while arguing that issues of state law predominate, concedes that these issues are not complicated and do not involve unsettled questions of law. On issues of contract law (in contrast, for example, to matters involving family law, probate law, condemnation law, or other specialized areas of the law not regularly addressed in the federal courts), there is no material difference, in this Court's view, in the ability of the state and federal courts to decide those issues.[48] In light of that, this factor does not weigh in favor of remand in any material fashion. See Nemsa, 1995 WL 489711 at *7 (the inability to explain in what way the New York law issues are either unsettled or complicated "significantly undercuts the degree to which the state law factor weights in favor of remand to New York courts").

### (4) Comity

Comity "focuses on the state's interest in developing its law and applying its law to its citizens." Renaissance Cosmetics, 277 B.R. at 16. ML Media is a Delaware limited partnership,[49] and not a New York domiciliary, but has its principal place of business in New York City. The Joint Venture is organized under New York law, but it owns 100% of the stock of a Delaware corporation. Defendant Adelphia is a Delaware corporation, with its principal place of business in Pennsylvania; Century is a Texas corporation, under Adelphia's control, with its principal place of business in Pennsylvania. Highland is a Pennsylvania general partnership, in which members of the Rigas family, who live in Pennsylvania, are members. There certainly is a New York nexus to this controversy, but it is difficult to conclude that it is an overriding one.

The parties agreed in the Recap Agreement that it would be subject to New York law, and agreed to venue in New York in the event of any dispute.[50] That was hardly unreasonable, but should be contrasted with situations where New York law must be applied by reason of a strong interest in regulating the matter in controversy-as it might, for example, in connection with landlord-tenant matters in the City or State of New York. This matter involves no matters of New York public policy, and hardly involves the New York public interest. The Court does not find comity to be a material factor.

### (5) Degree of Relatedness or Remoteness to Main Bankruptcy Case

The factor of relatedness or remoteness to the main bankruptcy case is significant in this case, and weighs heavily against remand. Counsel for the debtor-defendants Adelphia and Century has expressed the view that the Recap Agreement is an

---

**48.** Indeed, with respect to a major matter of controversy in this case, the status of interim agreements contemplating the execution of definitive documentation down the road, much of New York's most important law has been made in the federal courts. See, e.g., Teachers Insurance & Annuity Association of America v. Tribune Co., 670 F.Supp. 491 (S.D.N.Y.1987); Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69 (2d Cir.1989); Shann v. Dunk, 84 F.3d 73 (2d Cir.1996); Adjustrite Systems, Inc. v. Gab Business Services, Inc., 145 F.3d 543 (2d Cir.1998).

**49.** Amended Complaint at ¶ 11.

**50.** Recap Agmt at § 12.5.

executory contract, subject to section 365 of the Bankruptcy Code, with respect to which they are entitled to time to decide whether it will be assumed or rejected. ML Media has moved in this Court to require an earlier decision as to whether the Recap Agreement will be assumed or rejected. Matters with respect to that, which involve questions of federal bankruptcy law involving an exercise of this Court's "arising under" and "arising in" jurisdiction under section 1334(b)—as contrasted to its "related to" jurisdiction—will have an effect on the other defendants as well, for if Adelphia or Century were to assume and cure any existing defaults (e.g., payment of the $275 million), there would be dramatically smaller amounts for the Joint Venture and Highland to pay.[51] Litigating the contract issues in each of the state and federal courts could have the anomalous result of subjecting the non-debtor defendants to judgments that would lose their factual predicate in the event of an assumption of the Recap Agreement in the Bankruptcy Court.[52]

### (6) Existence of Right to Jury Trial

The right to jury trial, in this Court's view, tilts in favor of remand, but to only a very minor extent. Many of ML Media's claims have been and reasonably can be expected to be for equitable relief, for which there is no right to a jury trial in any event. On some matters, one or more of the litigants might wish a jury trial, which a bankruptcy judge could not preside over in the absence of consent,[53] but which a district judge could; in this respect, this factor does favor remand,[54] but it is tempered substantially by the fact that ML Media's claims could be heard, if necessary, by a district judge. This Court gives this factor some weight but not very great weight, as in this Court's view, the most important concerns are that ML Media's claims against all defendants be litigated together and in a coordinated way, and that they be coordinated with proceedings in the bankruptcy court. These concerns are far more important, in this Court's view, than concerns as to whether a bankruptcy judge, on the one hand, or a district judge, on the other, handles any ultimate jury trial.

### (7) Prejudice to Involuntarily Removed Defendants

This factor is inapplicable to the facts in this case, and most assuredly does not favor remand. There are no involuntarily removed defendants; all defendants in the action—Century, Adelphia, the Joint Venture and Highland—prefer this court.

**51.** In identifying these as issues, the Court is not purporting to fully analyze the section 365 issues, or to prejudge the rights of any party. At this juncture, it assumes, without deciding, that the Recap Agreement is executory; that assumption and rejection would be appropriate; that the Recap Agreement could be assumed; and that defaults could be cured. It is not determining those issues now, and does not consider any of the litigants to have waived any of its rights with respect to any of these issues.

**52.** The debtor-defendants also argue that while the property of the Joint Venture is not property of the debtor Century, Century's interest in the Joint Venture is, and that recoveries of stakeholders in the Adelphia cases would be affected, to a greater or lesser extent, by the outcome of this litigation. That may well be the case, but this Court elects not to place reliance on this point. This litigation necessarily must be determined on its merits, and not on its effect on stakeholders in the Adelphia cases.

**53.** See 28 U.S.C. § 157(e).

**54.** See Nemsa, 1995 WL 489711 at *8 (as Nemsa would not have a jury trial as a matter of right, "[t]his factor thus favors remand," but nevertheless determining not to remand).

For all of those reasons, this Court believes not only that equitable remand would be unwarranted; it would actually be contrary to the interests of justice. In its discretion, the Court declines to order it.

*Conclusion*

For the foregoing reasons, ML Media's motion is denied, with respect to each of the Joint Venture and Highland.

So Ordered.